1

**BRODSKY SMITH**
Evan J. Smith (SBN 242352)
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile: (310) 247-0160
Email: esmith@brodskysmith.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

2

3

4

5

6

7

8

9        **UNITED STATES DISTRICT COURT**
         **NORTHERN DISTRICT OF CALIFORNIA**

10

11   SHIVA STEIN, derivatively on behalf of SUPER        C.A. No.
     MICRO COMPUTER, INC.,

12

13                       Plaintiff,                       **VERIFIED STOCKHOLDER**
                                                          **DERIVATIVE COMPLAINT**

14           v.

15   CHARLES LIANG, CHIU-CHU LIU LIANG,
     HWEI-MING TSAI, SHERMAN TUAN,

16   MICHAEL S. MCANDREWS, SARIA
     TSENG, YIH-SHYAN LIAW, LAURA

17   BLACK, and HOWARD HIDESHIMA,

18                       Defendants,

19

20           - and –

21   SUPER MICRO COMPUTER, INC.,

22                       Nominal Defendant.

23

24

25

26

27

28

Plaintiff Shiva Stein ("Plaintiff"), by and through her undersigned attorneys, brings this stockholder derivative complaint for the benefit of nominal defendant Super Micro Computer, Inc. ("Super Micro" or the "Company"), against Defendants Charles Liang ("C. Liang"), Howard Hideshima ("Hideshima"), Yih-Shyan (Wally) Liaw ("Liaw"), Chiu-Chu Liu Liang ("Sara Liang"), Hwei-Ming (Fred) Tsai ("Tsai"), Sherman Tuan ("Tuan"), Michael S. McAndrews ("McAndrews"), Saria Tseng ("Tseng"), and Laura Black ("Black") (collectively, the "Individual Defendants," and together with Super Micro, the "Defendants") for Breach of Fiduciary Duty, Waste of Corporate Assets, Unjust Enrichment, and Contribution for Violations of Federal Securities Laws.

Plaintiff's allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by Super Micro with the U.S. Securities and Exchange Commission ("SEC"), SEC orders, press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, a securities class action complaint that was recently sustained,[1] and matters of public record.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Super Micro against certain of its officers and directors seeking redress for conduct that occurred between August 5, 2016 and January 30, 2018 (the "Relevant Period") and have caused substantial harm to Super Micro.

2.      Super Micro is a server technology company and a provider of computing solutions, integration and support services for data center, cloud computing, enterprise IT, and big data.

3.      In September 2017, Super Micro conducted an internal audit that led to financial

---

[1] *See Hessefort v. Super Micro Computer, Inc. et al*, C.A. No. 4:18-cv-00838 (N.D. Cal.) (the "Securities Class Action").

restatements for the fiscal years 2013 through 2017 (the "Restatement"). Prior to the restatement, Super Micro had overstated its revenue by $104.7 million (1.1 percent), net income by $20.3 million (6.8 percent), and earnings per share by $0.41 (6.8 percent). The Company also overstated its quarterly results, including GAAP EPS, by as much as 32%, quarterly revenue by as much as $40 million or 6%, and accounts receivable by as much as 65%.

4.      The Individual Defendants also caused Super Micro to fail to meet its U.S. Securities and Exchange Commission ("SEC") filing deadlines twice due to accounting irregularities; requiring the Company to issue a prior period adjustment. Thereafter, the Individual Defendants caused the Company to make public statements to assure investors that it had taken steps to fix the issues, including through substantial investment in the implementation of a SAP SE ("SAP") accounting system.

5.      In October 2017, the Company disclosed that a sales transaction had been improperly recorded as revenue a quarter too early, and the Company's Audit Committee (the "Audit Committee") began an investigation into the matter, causing the Company to fail to meet its SEC filing requirements.

6.      Even after the Audit Committee completed its investigation, the Company announced that it would need time to analyze the impact of the investigation on the Company's historical financial statements, causing further delay for the Company to meet its 2018 SEC reporting obligations.

7.      On March 16, 2018, the Company disclosed that its stock would be subject to delisting by the NASDAQ Stock Market ("NASDAQ").

8.      On August 21, 2018, the Company disclosed that its SEC filings dating back to the Company's Form 10-K for the fiscal year 2017 would be delinquent and thus it expected to be delisted. The Company was eventually delisted on August 23, 2018.

9.      In May 2019, the Company filed its delayed Form 10-K for the fiscal year 2017 (the "2017 Form 10-K") which disclosed "material weaknesses" in the Company's internal controls over financial reporting.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

10.     The 2017 Form 10-K further disclosed that the Company had a "culture of aggressively focusing on quarterly revenue without sufficient focus on compliance" and that "[s]enior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company."

11.     The 2017 Form 10-K listed multiple examples of willful and deliberate sales and accounting misconduct which "officers and managers" were "aware of, condoned or were involved in," and used to manipulate financial results and improperly and prematurely recognize revenue including:

> (i) shipping products in advance of customer requested delivery dates, (ii) shipping products to storage facilities at the end of a quarter for later delivery to customers, (iii) in certain cases entering into side agreements with customers, (iv) in certain cases, shipping products before manufacturing was completed, (v) altering source documents related to some sales transactions and (vi) failing to disclose or obscuring material facts about sales transactions.

12.     The Company also admitted that Super Micro officers and managers sought to deceive Super Micro's Audit Committee and Deloitte & Touche LLP ("Deloitte") to conceal misconduct:

> Some employees, including officers and managers, also failed to raise issues with material accounting consequences to the Audit Committee and our external auditors, and with respect to one transaction, appear to have attempted to minimize material facts about a sales transaction to, or obscure those facts from, the Audit Committee and our external auditors.

13.     The 2017 Form 10-K also specified a remediation plan that included, among other things, restructuring the sales organization and establishing training programs.  The disclosed remediation plan also singled out Defendant C. Liang as needing training on compliant sales practices, effective internal controls and revenue recognition compliance.

14.     The 2017 Form 10-K disclosed that multiple high-ranking employees were replaced to address the accounting violations and misconduct, including the Chief Financial Officer ("CFO"), the Senior Vice President of International Sales the Corporate Controller, the Senior Vice President of Worldwide Sales, the Vice President, Strategic Accounts, the Vice President, Strategic Sales, the Vice President, Business Development and other sales personnel.  The Company also created new positions

for a Chief Compliance Officer, Vice President of Internal Audit, Senior Director of Tax, Financial Audit Director and Information Technology Audit Director.  The Company disclosed that Sara Liang – wife of Defendant C. Liang – was demoted from her officer position as Chief Administrative Officer and Treasurer to Senior Vice President.  The Company also revised its Code of Conduct with respect to "compliance and reporting."

15.     On August 25, 2020, the SEC entered three cease-and-desist orders (the "SEC Orders") against Defendants Super Micro, Howard Hideshima, former Senior Vice President and CFO, and C. Liang. The SEC Orders described the Company improperly accelerating revenue recognition and understating expenses in fiscal years 2015-2017, and explained that "Super Micro executives . . . failed to devise and maintain sufficient internal accounting controls with respect to proper revenue recognition."

16.     The SEC ordered Super Micro to pay a penalty of $17.5 million and to "cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and (3) of the Securities Act and Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B), of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder."

17.     In connection with the Restatement, Deloitte no longer provided a "clean" audit opinion but instead, as of June 30, 2017, "expressed an adverse opinion on the Company's internal control over financial reporting because of material weaknesses."   The Company has incurred $109 million in professional fees paid to accounting firms and law firms in connection with the Restatement.

18.     The Company's 2017 Form 10-K detailed numerous negative consequences of the Individual Defendants' conduct which placed "downward pressure on our stock price" and increased the degree of risk in investing in Super Micro.  The inability to file financial statements with the SEC negatively impacted the Company's financing, including its ability to raise debt or issue equity, and hurt the Company's ability to attract and retain employees.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

19.     The SEC Order against Defendant C. Liang found that he had "received profits from stock sales during the 12-month periods following the filings containing financial results that Super Micro restated as a result of misconduct."  Defendant C. Liang was therefore ordered to "reimburse Super Micro for a total of $2,122,000 pursuant to Section 304(a) of [the] Sarbanes-Oxley Act of 2002," and to "cease and desist from committing or causing any violations and any future violations of Section 304 of the Sarbanes Oxley Act of 2002."

20.     Because of the Individual Defendants' misconduct, which has subjected Super Micro, Defendant C. Liang, the Company's President, Chief Executive Officer ("CEO") and Chairman of the Board and Defendant Hideshima, former Senior Vice President and Chief Financial Officer ("CFO"), Senior Vice President and Chief Financial Officer ("CFO") Perry G. Hayes ("Hayes"), Senior Vice President-Investor Relations; and Defendant Liaw, former Sr. Vice President of International Sales and former member of the Board of Directors, to the Securities Class Action  pending in the United States District Court for the Northern District of California (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the Company will have to expend many millions of dollars.

21.     Indeed, on March 29, 2021, the Securities Class Action against the Company, Hayes, Defendant Hideshima, Defendant Liaw, and Defendant Charles Liang was sustained in part.  In his opinion Judge Jon S. Tigar denied Defendant Hideshima's motion to dismiss and granted in part and denied in part the Company's motions to dismiss the Securities Class Action.  Specifically, the 10(b) claims against Hayes and Defendant Liaw and 20(a) claim against Hayes were dismissed, while the 10(b) claims against Defendants Hideshima and C. Liang and 20(a) claims against Defendants Hideshima, C. Liang, and Liaw survived the motions to dismiss.

22.     Furthermore, in light of the breaches of fiduciary duty by the Individual Defendants, their collective engagement in the wrongdoing alleged herein, the substantial likelihood of liability in the

Securities Class Action and this derivative action, the Individual Defendants' longtime relationships with each other, and their not being disinterested or independent, a majority of Super Micro's Board of Directors (the "Board") cannot consider a demand to commence litigation on behalf of the Company.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction pursuant to 28 U.S.C. §1331 over (i) the contribution claims asserted herein under section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78u-4(f), and (ii) the claims asserted herein for breach fiduciary duty premised upon duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law.  This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over all other claims that are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

24.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over all other claims that are so related to claims in this action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

25.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

26.     This Court has personal jurisdiction over the Company because it is incorporated in this District, and each of the Individual Defendants has minimum contacts with this District to justify the exercise of jurisdiction over them.

27.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## PARTIES

### Plaintiff

28.     Plaintiff Shiva Stein is and was at relevant times, a shareholder of Super Micro.  Plaintiff still retains her Super Micro shares.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

29.     Nominal Defendant Super Micro is a Delaware corporation, headquartered at 980 Rock Avenue San Jose, CA 95131.  The Company has over 3,500 employees and over 800 customers.  Super Micro's stock trades on NASDAQ, under the symbol "SMCI."  Throughout the Relevant Period, Super Micro disseminated SEC filings, press releases, investor presentations, marketing materials, product descriptions, and other reports containing material misrepresentations and omissions.

### Individual Defendants

30.     Defendant C. Liang at all relevant times has served as Company's President, CEO and Chairman of the Board.  Defendant C. Liang is named in the Securities Class Action complaint that alleges he violated Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)).  Defendant C. Liang knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's widespread accounting violations and fundamental internal control failures.   Super Micro paid Defendant. C. Liang the following compensation as an executive:

| Year | Salary | Bonus | Stock Awards | Option Awards | Total |
|------|--------|-------|--------------|---------------|-------|
| 2018 | $386,212 | - | $3,252,000 | $1,644,005 | $5,282,217 |
| 2017 | $386,212 | $650 | - | - | $386,862 |
| 2016 | $363,776 | - | - | - | $363,776 |

31.     Defendant Hideshima was the Senior Vice President and CFO of the Company until his employment was immediately terminated on January 30, 2018 without prior announcement.  Defendant

Hideshima knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's widespread accounting violations and fundamental internal control failures. Hideshima had served as CFO since May 2006. Defendant Hideshima is named in the Securities Class Action complaint that alleges he violated Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)). Super Micro paid Defendant Hideshima the following compensation as an executive:

| Year | Salary | All Other Compensation | Total |
|------|--------|------------------------|-------|
| 2016 | $321,146 | $1,500 | $322,646 |

32.     Defendant Liaw was a co-founder of the Company. He served as Senior Vice President of International Sales, Corporate Secretary and a member of the Board of Directors from inception in September 1993 until his immediate termination on January 30, 2018. Defendant Liaw knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning the Company's widespread accounting violations and fundamental internal control failures. Liaw also owned 4.6% of the outstanding shares of the Company. Defendant Liaw is named in the Securities Class Action complaint that alleges he violated Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)). Super Micro paid Defendant Liaw the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Total |
|------|--------|--------------|---------------|-------|
| 2016 | $232,864 | $109,959 | $105,089 | $447,912 |

33.     Defendant Sara Liang is a cofounder and a Super Micro Director and has been since at least March 2007. Defendant Sara Liang is also Super Micro's Senior Vice President and has been since May 2019. She was Treasurer from September 1993 to May 2019; Chief Administrative Officer from October 1993 to May 2019; and Senior Vice President of Operations from May 2015 to February 2018. Defendant Sara Liang is married to Defendant C. Liang. Defendant Sara Liang knowingly, in bad faith,

or in conscious disregard for her duties caused or allowed Super Micro to make improper statements in the Company's press releases and public filings concerning the Company's widespread accounting violations and fundamental internal control failures.  Super Micro paid Defendant Liang the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Total |
|------|--------|--------------|---------------|-------|
| 2016 | $237,253 | $110,484 | $113,961 | $461,698 |

34.     Defendant Tsai is a Super Micro director and has been since August 2006. Defendant Tsai is also a member of the Audit Committee and has been since at least February 2016.  Defendant Tsai knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Super Micro to make improper statements in the Company's press releases and public filings concerning the Company's widespread accounting violations and fundamental internal control failures.  While in possession of material, nonpublic information concerning Super Micro's true business health, Defendant Tsai sold 21,000 shares of his stock for $544,039 in proceeds.  Super Micro paid Defendant Tsai the following compensation as a director:

| Fiscal Year | Fee Earned or Paid in Cash | Option Awards | Total |
|-------------|---------------------------|---------------|-------|
| 2018 | $110,000 | - | $110,000 |
| 2017 | $50,000 | $55,800 | $105,800 |
| 2016 | $50,000 | $70,491 | $120,491 |

35.     Defendant Tuan is a Super Micro director and has been since February 2007.  Defendant Tuan knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Super Micro to make improper statements in the Company's press releases and public filings concerning the Company's widespread accounting violations and fundamental internal control failures.  While in possession of material, nonpublic information concerning Super Micro's true business health, Defendant Tuan sold 10,000 shares of his stock for $245,123 in proceeds.  Super Micro paid Defendant Tuan the following compensation as a director:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Fiscal Year | Fee Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2018 | $47,500 | - | $47,500 |
| 2017 | $47,500 | $55,800 | $103,300 |
| 2016 | $47,500 | $70,491 | $117,991 |

36.     Defendant McAndrews is a Super Micro director and has been since February 2015. Defendant McAndrews is also a member of the Audit Committee and has been since at least February 2016. Defendant McAndrews knowingly, in bad faith, or in conscious disregard for his duties caused or allowed Super Micro to make improper statements in the Company's press releases and public filings concerning the Company's widespread accounting violations and fundamental internal control failures. Super Micro paid Defendant McAndrews the following compensation as a director:

| Fiscal Year | Fee Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2018 | $100,500 | - | $100,500 |
| 2017 | $42,500 | $50,220 | $92,720 |
| 2016 | $42,500 | $63,442 | $105,942 |

37.     Defendant Tseng is a Super Micro director and has been since November 2016. Defendant Tseng knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Super Micro to make improper statements in the Company's press releases and public filings concerning the Company's widespread accounting violations and fundamental internal control failures. Super Micro paid Defendant Tseng the following compensation as a director:

| Fiscal Year | Fee Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2018 | $45,000 | - | $45,000 |
| 2017 | $33,750 | $229,049 | $262,799 |

38.     Defendant Black was a Super Micro director from April 2012 to June 2019. Defendant Black was also Chair and a member of Audit Committee from at least February 2016 to at least May 2019. Defendant Black knowingly, in bad faith, or in conscious disregard for her duties caused or allowed Super Micro to make improper statements in the Company's press releases and public filings concerning

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

the Company's widespread accounting violations and fundamental internal control failures.  Super Micro paid Defendant Black the following compensation as a director:

| Fiscal Year | Fee Earned or Paid in Cash | Option Awards | Total |
|---|---|---|---|
| 2018 | $123,000 | - | $123,000 |
| 2017 | $65,000 | $83,700 | $148,700 |
| 2016 | $65,000 | $105,737 | $170,737 |

39.    Defendants C. Liang, Sara Liang, Liaw, Tsai, Tuan, McAndrews, Tseng, and Black are referred to herein as the "Director Defendants."

40.    Defendants C. Liang, Sara Liang, Liaw, and Hideshima are referred to herein as the "Officer Defendants."

41.    Defendants Tsai, McAndrews, and Black are referred to herein as the "Audit Committee Defendants."

**Relevant Nonparty Board Members**

42.    Daniel W. Fairfax has served as a director of the Company since July 1, 2019.

43.    Tally Liu has served as a director of the Company since January 30, 2019.

44.    Fred Chan has served as a director of the Company since October 28, 2020.

**<u>FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS</u>**

45.    Each Individual Defendant, by virtue of his/her position as a director and/or officer, owed to Super Micro and to its stockholders the fiduciary duties of loyalty and care.  The Director Defendants were, and are, required to act in furtherance of the best interests of Super Micro and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefit.

46.    The Director Defendants, because of their positions of control and authority as directors and/or officers of Super Micro, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial

positions with Super Micro, each Individual Defendant had knowledge of material non-public information regarding the Company.

47.     To discharge their duties, the officers and directors of Super Micro were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Super Micro were required to, among other things:

      a.    Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

      b.    Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

      c.    Exercise good faith to ensure that the Company's communications with the public and with stockholders are made with due candor in a timely and complete fashion; and

      d.    When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

### Additional Duties Under the Company's Code of Conduct

48.     The Individual Defendants, as officers and directors of Super Micro, were bound by the Company's Code of Business Conduct and Ethics (the "Code").  The Code sets out basic principles to instruct all directors, officers, and employees of Super Micro, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the

appearance of improper behavior. In particular, the Code Provides:

## II. COMPLIANCE WITH LAWS, RULES AND REGULATIONS

The Company is obligated to comply with all applicable laws and regulations in all countries in which it operates.

The Company is committed to full compliance with the laws and regulations of the cities, states and countries in which it operates. You must comply with all applicable laws, rules and regulations in performing your duties for the Company. Numerous federal, state and local laws and regulations define and establish obligations with which the Company, its employees and agents must comply. Under certain circumstances, local country law may establish requirements that differ from this Code. You are expected to comply with all local country laws in conducting the Company's business. If you violate these laws or regulations in performing your duties for the Company, you not only risk individual indictment, prosecution and penalties, and civil actions and penalties, you also subject the Company to the same risks and penalties. If you violate these laws in performing your duties for the Company, you may be subject to immediate disciplinary action, including possible termination of your employment or affiliation with the Company.

The Chief Executive Officer ("**CEO**"), Chief Financial Officer ("**CFO**"), Chief Compliance Officer ("**Compliance Officer**"), General Counsel and Controller (or persons performing similar functions) of the Company are also required to promote compliance by all employees with the Code and to abide by Company standards, policies and procedures.

An explanation of certain key laws, rules, regulations, standards, policies and procedures with which you should be familiar can be found on the Company's intranet. As explained below, you should always consult your manager, the CFO, the General Counsel, or the Compliance Officer, with any questions about the legality or appropriateness of your or your colleagues' conduct.

49.     With respect to the Company's directors, officers, and employees' commitment to ensure the Company's financial integrity and accurate records, the Code provides:

## III.   FULL, FAIR, ACCURATE, TIMELY AND UNDERSTANDABLE DISCLOSURE

All disclosure in reports and documents that the Company files with, or submits to, the SEC, and in other public communications made by the Company must be full, fair, accurate, timely and understandable. You must take all steps available to assist the Company in these responsibilities consistent with your role within the Company. To ensure that the Company meets this standard, you (to the extent you are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes and procedures applicable to the Company commensurate with your duties. In particular, you are required to provide prompt and accurate answers to all inquiries made to you in connection with the Company's preparation of its public reports and disclosure. You are prohibited from knowingly misrepresenting, omitting or causing others to

misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators and self- regulatory organizations.

The Company's CEO and CFO are responsible for designing, establishing, maintaining, reviewing and evaluating on a quarterly basis the effectiveness of the Company's disclosure controls and procedures (as such term is defined by applicable SEC rules). The Company's CEO, CFO, Controller, General Counsel and such other Company officers designated from time to time by the Audit Committee of the Board of Directors shall be deemed the "Senior Officers" of the Company. Senior Officers shall take all steps necessary or advisable to ensure that all disclosure in reports and documents filed with or submitted to the SEC, and all disclosure in other public communications made by the Company is full, fair, accurate, timely and understandable.

50.    In addition to these duties, under its Audit Committee Charter, the Audit Committee Defendants, Defendants McAndrews, Tsai, and Black, owed specific duties to Super Micro to assist the Board in overseeing the integrity of the Company's financial statements, the Company's compliance with legal and regulatory requirements, and the Company's internal controls over financial reporting, among other things.  In particular, the Audit Committee Charter at all relevant times stated:

**B. Review of Financial Reporting Policies and Processes**

To fulfill its responsibilities and duties, to the extent that it deems necessary or appropriate, and in addition to the items described above, the Committee shall:

1.Discuss with the independent auditor any audit problems or difficulties and management's response.

2. Review and discuss with management and the independent auditor the annual audited financial statements to be included in the Company's annual reports on Form 10-K, the quarterly financial statements to be included in the Company's quarterly reports on Form 10-Q, and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

3. Review and discuss with management press releases regarding the Company's financial results, as well as financial information and earnings guidance provided to securities analysts and rating agencies.

4. Review with management and the independent auditor any significant judgments made in management's preparation of the financial statements and the view of each as to appropriateness of such judgments.

**C. Risk Management, Related Party Transactions, Legal Compliance and Ethics**

In addition, the Committee shall have the following authority and responsibilities:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1. Review any report on significant deficiencies in the design or operation of the Company's internal control structure and procedures for financial reporting ("Internal Controls") that could adversely affect the Company's ability to record, process, summarize or report financial data, any material weaknesses in the Internal Controls identified to the auditors, and any fraud, whether or not material, that involves  management or other employees who have a significant role in the Internal Controls.

2. Review and approve the internal audit function's (i) audit plan, (ii) all major changes to the audit plan, (iii) the scope, progress and results of executing the internal audit plan, and (iv) the annual performance of the internal audit function.

3. Periodically review with management the Company's disclosure controls and procedures and internal control over financial reporting as defined in applicable SEC rules.

*        *        *

6. Review and investigate conduct alleged to be in violation of the Company's Code of Business Conduct and Ethics, and adopt as necessary or appropriate, remedial, disciplinary or other measures with respect to such conduct.

7. Periodically discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control the exposures, including the Company's risk assessment and risk management guidelines and policies.

8. Prepare the audit committee report required by the rules of the SEC to be included in the Company's annual proxy statement.

51.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Super Micro, the absence of good faith on their part, and a reckless disregard for their duties to the Company of which the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

52.     The Individual Defendants breached their duty of loyalty by allowing Defendants to cause, or by themselves causing, the Company to engage in an unlawful accounting scheme, maintain ineffective internal controls and disclosure controls, and make false and misleading statements to the public, improper practices that wasted the Company's assets, and caused Super Micro to incur substantial damage.

53.     The Individual Defendants, because of their positions of control and authority as officers

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

and/or directors of Super Micro, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Super Micro has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

54.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

55.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Super Micro, regarding the Individual Defendants' management of Super Micro's operations and rampant accounting violations; and (ii) enhance the Individual Defendants' executive and directorial positions at Super Micro and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

56.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning accounting errors contained in the Company's financial statements, including errors concerning one of its sales transactions.

57.     The Individual Defendants accomplished their conspiracy, common enterprise, or common course of conduct by causing the Company to purposefully or recklessly engage in improper

accounting practices and release false and misleading financial statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, or common course of conduct complained of herein.

58.     Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Company Overview and Background

59.     Super Micro designs, develops, manufactures, and sells server solutions based on modular and open-standard architecture.   Super Micro offers servers, motherboards, chassis, and accessories. Super Micro markets its products worldwide.   As described by Super Micro, it is a global leader in high performance, high efficiency server technology and innovation, and it develops and provides end-to-end green computing solutions to the data center, cloud computing, enterprise IT, big data, HPC, and embedded markets.

60.     In the three fiscal years leading up to the Relevant Period, the Individual Defendants caused Super Micro to falsely claim to meet or beat full-year consensus estimates on key metrics including EPS and revenue – false statements would not be revealed until after the Relevant Period with the Restatement.

61.     The Individual Defendants caused the Company to improperly recognize revenue upon shipment of its products prior to customer delivery – or sometimes even before shipment – in violation of GAAP, the Company's revenue recognition policies and procedures, and the Code of Conduct.   For

example, as alleged in the Securities Class Action, a customer requested that Super Micro deliver nearly $800,000 worth of products by mid-January 2015.  Instead, Super Micro directed its freight forwarder pick up the products before the end of December 2014, hold them, and then deliver the products to the customer two weeks into the next quarter; Super Micro improperly recorded the sale in the second quarter for fiscal year 2015. In another instance, Super Micro asked a different distributor customer to agree to accept approximately $104,000 of products before the end of fiscal year 2015 that the customer did not need or have space for.  Super Micro paid for the products to be stored in trailers for approximately six months (well into fiscal year 2016) but improperly recognized revenue upon shipment in fiscal year 2015.

62.     Additionally, the Individual Defendants caused the Company to improperly inflate earnings by using co-op marketing funds to pay for its own expenses unrelated to marketing.  For example, in connection with one of its vendor's co-op marketing programs, Super Micro submitted claims for approximately $660,000 during fiscal year 2013 to fiscal year 2015 to which Super Micro was actually not entitled, understating expenses and overstating income.  Super Micro improperly used the funds for non-marketing activities, including, among other things: to pay for storing goods at facilities when customers were not willing to accept goods before quarter end; to pay for shipping costs that were Super Micro's responsibility; to recoup losses from goods that customers returned; to pay for repairs even though the customer had extended warranties; and to pay for Christmas gifts for customers.

63.     During fiscal years 2015-2016, at the same time Defendants were reporting false financial results, the Company also twice failed to timely file its required financial reports with the SEC.  First, at the end of August 2015, the Company required a 15-day extension to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2015 (the "2015 Form 10-K") because it discovered irregularities regarding certain marketing expenses; second, in November 2015, the Company disclosed issues with extended warranties which should have been accounted for as deferred revenue, resulting in a delayed Form 10-Q for the first quarter of fiscal 2016 and a prior period adjustment that was corrected in the same

period.  This prior period adjustment resulted in the Company amending its previously filed to fiscal year 2015 Form 10-K.  Specifically, on November 16, 2015, the Company filed a Form 10-K/A to restate that its disclosure controls and procedures and its internal controls over financial reporting as of June 30, 2015, were ineffective because of a material weakness related to its revenue recognition of contracts with extended product warranties.  Notably, the Individual Defendants caused the Company to assure investors that it had taken the necessary steps to remedy these issues through a remediation plan for the material weakness and substantial investment in the implementation of the SAP accounting system.

64.     On January 13, 2016, Defendant Hideshima spoke at the Needham Growth Conference about Super Micro's adoption of the new SAP based accounting that went live in July 2015, and noted that the Company had invested in infrastructure and accounting processes to avoid delayed SEC filings:

> [Unidentified Audience Member]: I don't want to embarrass you as a CFO, but we've had a couple of surprises on the accounting side and I would like to get your perspective or what you learned about it, what you are doing actively so that we are not overexposed to surprises.
>
> [Hideshima]: We have had a couple of missteps in the last couple of quarters. Timing wise was unfortunate, because they seemed to happen back to back with each other. Somewhat unrelated events, but both delayed our K filing and our Q filing.
>
> ***We have added a new accounting system, SAP***. We went live in the US in July. We just went live in the Netherlands and Taiwan; they have gone well. ***But we have invested in our infrastructure to improve our accounting and our books and what have you and our ability to manage the operations in the Company***. This is an investment we have made for a number of different years.
>
> ***On the accounting side of it we have increased our resources in that area too and increased our processes. So, again, we are hopeful that it doesn't happen again***.
>
> [Unidentified Audience Member]: But the other side would be people-related or the entities regarding that. I'm just trying to get more color?
>
> [Hideshima]: Both. They go in conjunction with each other because the system will provide data to us. ***We will analyze the data, build processes around the new data that we have for it. Again, it's a combination of both, more efficient system backing up, generating reports; obviously more people reviewing and looking at the reports***.

65.     Then on July 18, 2016, Super Micro pre-announced disappointing preliminary results for

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

the completed fourth quarter for fiscal 2016, including revenue of $520-$524 million, down from previous guidance of $580-$640 million; EPS of $0.15-$0.17, down from previous guidance of $0.46-$0.58; and gross margin of 14%, down from 15.7%. This poor pre-announcement put significant pressure on the Company to meet or exceed the pre-announced ranges.

66.    On August 2, 2016, Roth Capital Partners issued a report titled "SMCI: Thursday's Earnings Call Could be Pivotal," noting that the Company's upcoming earnings conference call and the Company's financial results would define the Company's growth story to Wall Street:

> *[W]e believe this Thursday's call has the potential to be a pivotal event for the company*. Either it will be able to convince us and the rest of the Street that the June debacle was an anomaly and that its go-to-market strategy differentiates it from the competition, or we will be faced with the prospects of a slower growth company achieving substantially lower gross margins than we previously perceived.

67.    Facing this pivotal event, the Individual Defendants began to issue a series of improper statements regarding the Company's financials, financial prospects, and disclosure controls. They described Super Micro as "one of the fastest growing companies in the IT industry," well positioned for future growth.

**The Company Makes Improper Statements Concerning Its Financial Growth, Its Compliance with GAAP, and Its Material Weaknesses in Internal Controls**

68.    In truth, the Individual Defendants caused the Company to engage in fraudulent accounting practices in violation of GAAP and its own critical accounting policies, resulting in an inflated financial position. Under GAAP, the Defendants were required to follow the revenue recognition rules found in the Financial Accounting Standards Board's ("FASB") Accounting Standards Codification Topic 605, *Revenue Recognition,* ("ASC 605"). Under ASC 605, revenue can only be appropriately recognized when it is both realized, or realizable, and earned. Revenue and gains are realized when products, merchandise, or other assets are exchanged for cash or claims to cash, while revenue and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash. ASC 605-10-25-1.  Similarly, revenue is earned when an "entity has substantially

- 20 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

accomplished what it must do to be entitled to the benefits represented by the revenues." ASC 605 lists four criteria that must be met before revenue can be appropriately "realized" and "earned": (i) "Persuasive evidence of an arrangement exists"; (ii) "Delivery has occurred or services have been rendered"; (iii) "The seller's price to the buyer is fixed or deter minable"; and (iv) "Collectability is reasonably assured." ASC 605-I0-S99-1.

69.     Unbeknownst to investors, the Individual Defendants were causing Super Micro to prematurely record revenue in contravention of all four criteria. Specifically, the Individual Defendants caused the Company to improperly recognize and report revenue by:

> (1) recognizing revenue before delivering the goods to customers; (2) sending goods to customers prior to the customer-specified delivery date; (3) improperly changing the shipment rather than when the goods were delivered to the customer; (4) recognizing revenue with respect to transactions that included customer acceptance terms before the customers had accepted the goods; (5) sending incomplete or mis-assembled goods to customers at the end of quarters; (6) recognizing revenue on sales to a large distributor upon shipment, when the revenue should have been recognized when Super Micro received payment from the distributor; (7) holding the bill of lading for certain overseas customers and thus preventing the customers from taking possession of the goods as a means to ensure payment, but nevertheless improperly recognizing the revenue upon shipment; and (8) recognizing certain extended warranty revenue at the time of sale, rather than amortizing the revenue over the length of the warranty.

70.     Furthermore, the Individual Defendants also caused the Company to improperly underreport certain expenses by misusing its cooperative marketing program to pay a variety of unrelated expenses, submitting claims for funds to which it was not entitled, and failing to reduce inventory and record an associated expense in instances where it no longer held the inventory for sale.

71.     Based on the foregoing, Super Micro lacked effective internal controls and disclosure controls over its financial reporting.

72.     Moreover, between August 4, 2016 and January 30, 2018, the Individual Defendants made false or misleading statements and failed to disclose that: (i) Super Micro suffered from an inappropriate tone at the top, had a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance, and failed to monitor or enforce its own code; (ii) Super Micro had significant material

weaknesses in internal controls related to revenue recognition, and did not have sufficient management, accounting, and financial reporting employees with appropriate knowledge, experience, and training, resulting in material errors in its reported financials; (iii) the Company violated GAAP and its own policies by, among other things, shipping products in advance of customer requested delivery dates, shipping products to storage facilities for later delivery, entering into side agreements, shipping incomplete products, and altering source documents related to transactions; (iv) the Company's officers and managers failed to raise issues with material accounting deficiencies and attempted to conceal information concern at least one sales transaction from the Audit Committee and auditors; (v) the Company prematurely and improperly recognized revenue for extended warranties and on-site services at the time of sale and failed to remediate this previously disclosed material weakness; (vi) the accounting for transactions from fiscal year 2013 through fiscal year 2017 required reassessment, and the adjustments coupled with their aggregate magnitude required Super Micro to restate its financial results; and (vii) as a result, the Company was exposed to the risk of financial restatement, inability to attest to the accuracy of its historical financial statements, inability to obtain auditor sign-off, an adverse audit opinion from its auditor, significant investigative and remediation costs, inability to attract or retain employees, delisting from the NASDAQ, and investigation by the SEC and other regulatory action.

73. On August 4, 2016, after the close of trading, Super Micro filed a Current Report on Form 8-K, which included a press release titled "Super Micro Computer, Inc. Announces 4th Quarter 2016 Financial Results," and slides for the Company's earnings presentation, that touted the Company's financial results, significantly beating its disappointing pre-announcement, particularly EPS (non-GAAP), which was reported at $0.20, (above the pre-announcement of $0.15-$0.17). In particular, the press release stated:

- ***Quarterly net sales of $524.3 million . . . .***

- ***GAAP net income of $7.0 million . . . .***

- ***GAAP gross margin was 14.1% . . . .***

\*     \*     \*

***GAAP net income for the fourth quarter of fiscal year 2016 was $7.0 million or $0.13 per diluted share***, a decrease of 73.9% from net income of $26.7 million, or $0.51 per diluted share in the same period a year ago. Included in net income for the quarter is $4.4 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, ***non-GAAP net income for the fourth quarter was $10.4 million, or $0.20 per diluted share,*** compared to non-GAAP net income of $30.0 million, or $0.57 per diluted share, in the same quarter of the prior year.

\*     \*     \*

***Fiscal Year 2016 Summary***

***Net sales for the fiscal year ended June 30, 2016 were $2,215.6 million, up 11.3% from $1,991.2 million for the fiscal year ended June 30, 2015. GAAP net income for fiscal year 2016 decreased to $72.0 million, or $1.39 per diluted share, a decrease of 29.3% from $101.9 million, or $2.03 per diluted share, for fiscal year 2015.*** Included in net income for the fiscal year ended June 30, 2016 is $16.1 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, ***non-GAAP net income for the fiscal year 2016 was $83.8 million or $1.59 per diluted share***, a decrease of 24.9% compared to $111.6 million or $2.15 per diluted share for fiscal year 2015.

\*     \*     \*

"[W]e will take actions to leverage our capacity and improve operational efficiency to become more flexible and competitive in winning new business. By offering the best value for innovation and emphasizing strategic customer relationships, ***we are confident that we can achieve stronger growth and improve financial performance.***"

74.     The Company's press release also reported on its consolidated balance sheet as of June 30, 2016, among other financial accounts, accounts receivable (net) of $288.9 million, inventories of $449.0 million, accrued liabilities of $55.6 million and retained earnings of $446.0 million.

75.     Also on August 4, 2016, the Company held an earnings conference call to discuss the fourth quarter and full year 2016 results.  During the call, Defendant C. Liang highlighted the Company's revenue growth and the implementation of its new SAP accounting system to assure investors of the strength of Super Micro's internal controls.  In particular, he stated:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

*For the entire fiscal year, we saw 11% [revenue growth] for the year, which means Super Micro is still one of the fastest-growing companies in the IT industry*.

\*　　　\*　　　\*

We are undergoing a restructure of our operational infrastructure, including our global SAP implementation, new global tax restructure, and bonded warehouse. These investments will streamline the business, improve efficiency, and increase profitability in long-term . . . . We expect to complete the whole restructuring in the December quarter this year. And after that, we will be more efficient than ever before.

\*　　　\*　　　\*

And our global operation and ***automation have been significantly improving***. We know the urgency to improve. And we are leveraging all of our strength and capacity to create a competitive vertical position for our customers.

\*　　　\*　　　\*

We are much better positioned with our new global SAP implementation, new global operation and corporate tax restructure, and bonded warehouse.

\*　　　\*　　　\*

Basically it's a big transition. And not just SAP implementation global wide, but also a big impact from our restructure for production, operation, and also global tax, a new system.

\*　　　\*　　　\*

I guess start from December quarter, right? Start from October, for example, as our SAP global reorg become much more stable, become more ready. Our iteration rate will grow and our volume, for sure, will grow. And that will improve our profit margin and overall profitability.

76.     On August 26, 2016, the Individual Defendants caused Super Micro to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2016 (the "2016 Form 10-K"). Defendants C. Liang, Hideshima, Liaw, Sara Liang, Black, McAndrews, Tsai, and Tuan each signed the 2016 Form 10-K. The 2016 Form 10-K contained certifications signed by Defendants Liang and Hideshima pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that assured investors that they did "not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading." The SOX

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

certifications also stated that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows," of Super Micro.

77.    The 2016 Form 10-K reiterated the Company's fourth quarter and full year financial results, and highlighted its commitment to maintaining effective internal controls, stating that prior material weaknesses in revenue recognition had been remediated. In particular, the 2016 Form 10-K stated:

> ***Evaluation of Effectiveness of Disclosure Controls and Procedures***
> We are committed to maintaining disclosure controls and procedures designed to ensure that information required to be disclosed in our periodic reports filed under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure.
>
> Under the supervision and with the participation of our management, including our Chief Executive Officer and our Chief Financial Officer, we evaluated the effectiveness of our disclosure controls and procedures, as such term is defined in Rule 13a-15(e) and 15d-15(e) promulgated under the Exchange Act. The evaluation considered the procedures designed to ensure that information required to be disclosed by us in the reports filed or submitted by us under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms and is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate to allow timely decisions regarding required disclosure. ***Based on that evaluation, our Chief Executive Officer and our Chief Financial Officer concluded that our disclosure controls and procedures were effective at a reasonable assurance level as of June 30, 2016***.
>
> \*      \*      \*
>
> **Remediation of Prior Year Material Weakness**
>
> As disclosed in our fiscal year 2015 Form 10-K/A, in November 2015 our management determined that we had a material weakness in the design of our internal controls related to recording revenue. ***Since that time, with the oversight of our management and audit committee, we have taken steps to remediate the material weakness to ensure that proper extended warranty and any other deliverables in our bill of materials are tracked and related revenue deferrals are recorded.*** The following steps have been implemented and performed:
>
> - Initiation of a review of extended warranty and any other deliverables in our bill of

materials for all products;

- Increased oversight and monitoring by our management of extended warranty and other deliverables in our bill of materials for any new products; and

- Documenting and tracking extended warranty and other deliverables in our contract matrix to ensure proper revenue recognition.

Our management believes the foregoing efforts *have effectively remediated the material weakness as these procedures have been implemented for a sufficient period of time beginning in the first half of fiscal year 2016* and we have completed our testing of the design and operating effectiveness of these above procedures as of June 30, 2016.

*      *      *

***Management's Report on Internal Control over Financial Reporting***
Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the criteria set forth in *Internal Control – Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). ***Based on our evaluation, our management has concluded that our internal control over financial reporting was effective as of June 30, 2016 to provide reasonable assurance regarding the reliability of financial reporting and preparation of consolidated financial statements for external reporting purposes in accordance with United States generally accepted accounting principles***.

78.     The 2016 Form 10-K also stated that the Company's consolidated financial statements complied with GAAP and complied with revenue recognition criteria.  In particular, the 2016 Form 10-K stated:

Our discussion and analysis of our financial condition and results of operations are based upon *our consolidated financial statements, which have been prepared in accordance with accounting principles generally accepted in the United States*. . . .

**Revenue recognition**. *We recognize revenue from sales of products when persuasive evidence of an arrangement exists, shipment has occurred and title has transferred, the sales price is fixed or determinable, collection of the resulting receivable is reasonably assured, and all significant obligations have been met. Generally this occurs at the time of shipment when risk of loss and title has passed to the customer if all other revenue recognition criteria have been met*. *Our standard arrangement with our customers includes a signed purchase order or contract, 30 to 60 days payment terms, Ex-works terms*, *except for a few customers who have free-on-board destination terms, for which revenue is recognized when the products arrive at the destination if all other revenue*

*recognition criteria have been met*.

**Multiple-element arrangements**. Our multiple-element product offerings including server systems with embedded software and support, which are considered separate units of accounting. We allocate revenue to each element in a multiple-element arrangement based upon their relative selling price. When applying the relative selling price method, we determine the selling price for each deliverable using vendor-specific objective evidence ("VSOE") of selling price, if it exists, or third-party evidence ("TPE") of selling price. If neither VSOE nor TPE of selling price exist for a deliverable, we use our best estimate of selling price for that deliverable. *Revenue allocated to each element is then recognized when all the revenue recognition criteria are met for each element.*

79.     The 2016 Form 10-K also stated that the Company had "adopted a 'Code of Business Conduct and Ethics' that is applicable to all directors and employees and embodies our principles and practices relating to the ethical conduct of our business and long-standing commitment to honesty, fair dealing and full compliance with all laws affecting our business."  Moreover, the 2016 Form 10-K directed readers to the Code located on the Company website, which stated:

*Senior Officers are also responsible for establishing and maintaining adequate internal control over financial reporting to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Senior Officers will take all necessary steps to ensure compliance with established accounting procedures, the Company's system of internal controls and generally accepted accounting principles. Senior Officers will ensure that the Company makes and keeps books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company. Senior Officers will also ensure that the Company devises and maintains a system of internal accounting controls sufficient to provide reasonable assurances that*:

- transactions are executed in accordance with management's general or specific authorization;

- *transactions are recorded as necessary (a) to permit preparation of financial statements in conformity with generally accepted accounting principles or any other criteria applicable to such statements, and (b) to maintain accountability for assets*.

80.     On October 27, 2016, the Individual Defendants caused Super Micro to file a Current Report on Form 8-K with the SEC, which included a press release announcing its first quarter of 2017 financial results.  Specifically, the press release stated:

- ***Quarterly net sales of $529.0 million . . . .***

- ***GAAP net income of $13.5 million . . . .***

- ***GAAP gross margin was 15.1% . . . .***

*          *          *

***GAAP net income for the first quarter of fiscal year 2017 was $13.5 million or $0.26 per diluted share,*** a decrease of 1.2% from net income of $13.7 million, or $0.27 per diluted share in the same period a year ago. Included in net income for the quarter is $4.5 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, ***non-GAAP net income for the first quarter was $16.7 million, or $0.32 per diluted share***, compared to non-GAAP net income of $16.5 million, or $0.32 per diluted share, in the same quarter of the prior year.

*          *          *

***"We are pleased that SuperMicro was able to report revenues and profits at the higher end of our expectations for the first quarter. . . ."*** said Charles Liang, President and Chief Executive Officer.

81.     The press release also reported on Super Micro's balance sheet as of September 30, 2016, including accounts receivable (net) of $328.3 million, inventories of $500 million, accrued liabilities of $60.8 million, and retained earnings of $459.5 million.

82.     The same day, Super Micro held an earnings conference call where Defendant C. Liang reiterated false and misleading first quarter financial results.  Defendant C. Liang further discussed the status of the implementation of the Company's SAP accounting system:

Last quarter we discussed the restructuring of our global operational infrastructure, including our new SAP implementation, global tax restructure and a bonded warehouse. This quarter we saw much smoother operations, and reduced impact from the transition. We expect to 100% complete the transition in this December quarter, and see sustained long-term improvement to our operational efficiency and profitability.

83.     On November 7, 2016, the Individual Defendants caused Super Micro to file the Company's Quarterly Report on Form 10-Q for the first quarter ended September 30, 2016 (the "Q1 2017 Form 10-Q") with the SEC, signed by Defendants C. Liang and Hideshima, and made similar false and misleading statements concerning its financial results as contained in the October 27, 2016 press release,

including among other matters, that the Company had earned $0.26 EPS, had net income of $13,532,000 and made net sales of $528,968,000.  As detailed above, the Company's Q1 2017 Form 10-Q also attached SOX certifications, signed by Defendants C. Liang and Hideshima, attesting that the financial statements were in compliance with GAAP and that the Company's disclosure controls and its internal controls over financial reporting were designed such that the controls were effective.  Further, the Q1 2017 Form 10-Q falsely stated: "The unaudited condensed consolidated financial statements included herein *reflect all adjustments, including normal recurring adjustments, which are, in the opinion of management, necessary for a fair presentation of the consolidated financial position, results of operations and cash flows for the periods presented*."

84.     Super Micro also disclosed in the Q1 2017 Form 10-Q that no changes had occurred concerning its critical accounting policies, including its revenue recognition policy, since its previous disclosure in its 2016 Form 10-K.  Specifically, it stated:

> *There have been no material changes in the matters for which we make critical accounting policies and estimates in the preparation of our Condensed Consolidated Financial Statements during the three months ended September 30, 2016*, as compared to those disclosed in our Annual Report on Form 10-K for the fiscal year ended June 30, 2016.

85.     On January 26, 2017, Super Micro filed a Current Report on Form 8-K with the SEC, which included a press release announcing its second quarter of 2017 financial results.  The press release stated:

- *Quarterly net sales of $652.0 million . . . .*

- *GAAP net income of $22.0 million . . . .*

- *GAAP gross margin was 14.3% . . . .*

*       *       *

*GAAP net income for the second quarter of fiscal year 2017 was $22.0 million or $0.43 per diluted share*, a decrease of 36.6% from net income of $34.7 million, or $0.67 per diluted share in the same period a year ago. Included in net income for the quarter is $4.7 million of stock-based compensation expense (pre-tax). Excluding this item and the related

tax effect, **non-GAAP net income for the second quarter was $25.0 million, or $0.48 per diluted share**, compared to non- GAAP net income of $38.0 million, or $0.73 per diluted share, in the same quarter of the prior year.

*       *       *

"**We are pleased to report record second quarter revenues of $652.0 million that exceeded our guidance and outpaced a strong compare with last year**. . . ." said Charles Liang, Chairman and Chief Executive Officer. "We expect to continue the growth of last quarter and be reflected in the year-over-year revenue growth in the March quarter based on an increasing number of sizable customer engagements demanding the performance and advantages of our leading product lines."

86.     The Company's press release also reported on its consolidated balance sheet as of December 31, 2016, among other financial accounts, accounts receivable (net) of $366.9 million, inventories of $599.3 million, accrued liabilities of $74.3 million and retained earnings of $481.5 million.

87.     The same day, Super Micro held an earnings conference call where Defendants C. Liang and Hideshima reiterated false and misleading second quarter financial results.  Defendants C. Liang and Hideshima stated that the implementation of the Company's SAP accounting system was complete and that its implementation improved their earnings guidance and bottom line:

[Analyst:] Is there a specific growth driver here . . .?

[Defendant C. Liang:] I guess the major reason is because we just finished our global operations [there]. I mean, in last fourth quarter, we mentioned we spent a lot of effort to beef up global operations, and that's including SAP implementation and global warehouse, (inaudible) warehouse. So now, **all of those have been ready, and global, on-site service [see some also] pretty ready now. That's how we are able to focus on (technical difficulty) and how to grow**.

*       *       *

[Analyst:] . . . My second topic is visibility. Your guidance ranges, again, a little bit more narrow than the prior quarter, and two quarters ago it was very wide. So, I take that as an implication of increasing visibility. Is that a correct characterization, there? . . .

[Hideshima:] . . . if we go back historically, you know, we went through a lot of investments last year with regard to SAP and our [bonded warehouse] and our reorganization. **Those investments have been made, and have been into the system for now over a year, or a year-and-a-half. So, some of those things have helped us improve our overall efficiency**.

88.     On February 7, 2017, after the close of trading, the Individual Defendants caused Super

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Micro to file the Company's (the "Q2 2017 Form 10-Q"), signed by Defendants C. Liang and Hideshima, and made similar false and misleading statements concerning its financial results as contained in the January 26, 2017 press release, including among other matters, that the Company had earned $0.43 EPS, had net income of $21,996,000 and made net sales of $651,954,000.

89.     The Company's Q2 2017 Form 10-Q also attached SOX certifications, signed by Defendants C. Liang and Hideshima, attesting that the financial statements were in compliance with GAAP and that the Company's disclosure controls and its internal controls over financial reporting were designed such that the controls were effective. Further, the Q2 2017 Form 10-Q falsely stated: "The unaudited condensed consolidated financial statements included herein *reflect all adjustments, including normal recurring adjustments, which are, in the opinion of management, necessary for a fair presentation of the consolidated financial position, results of operations and cash flows for the periods presented*."

90.     Super Micro also disclosed in the Q2 2017 Form 10-Q that no changes had occurred concerning its critical accounting policies, including its revenue recognition policy, since its previous disclosure in the 2016 Form 10-K.  In particular, the Q2 2017 Form 10-Q stated:

> *There have been no material changes in the matters for which we make critical accounting policies and estimates in the preparation of our Condensed Consolidated Financial Statements during the three and six months ended December 31, 2016*, as compared to those disclosed in our Annual Report on Form 10-K for the fiscal year ended June 30, 2016.

91.     On April 27, 2017, the Individual Defendants caused Super Micro to file a Current Report on Form 8-K which included a press release titled "Super Micro Computer, Inc. Announces 3rd Quarter 2017 Financial Results," and slides for the Company's earnings presentation.  The Individual Defendants caused the Company to claim it exceeded its high-end revenue guidance of $630 million, reporting $631.1 and reported EPS (non-GAAP) of $0.38, in line with street consensus of $0.38:

- *Quarterly net sales of $631.1 million . . . .*

- ***GAAP net income of $16.7 million . . . .***

- ***GAAP gross margin was 14.0% . . . .***

*       *       *

***GAAP net income for the third quarter of fiscal year 2017 and for the same period a year ago were both $16.7 million or $0.32 per diluted share.*** Included in net income for the quarter is $4.8 million of stock-based compensation expense (pre- tax). Excluding this item and the related tax effect, ***non-GAAP net income for the third quarter was $20.3 million, or $0.38 per diluted share,*** compared to non- GAAP net income of $19.0 million, or $0.36 per diluted share, in the same quarter of the prior year.

92.      The Company's press release also reported on its consolidated balance sheet as of March 31, 2017, among other financial accounts, accounts receivable (net) of $391.3 million, inventories of $642.3 million, accrued liabilities of $70.9 million and retained earnings of $498.2 million.  In addition, Defendant C. Liang highlighted the Company's purported "resurgent revenue growth" and stated that "[w]e are pleased to report third quarter revenues that exceeded our guidance in a quarter complicated by shortages memory and SSD."

93.      On May 10, 2017, the Individual Defendants caused Super Micro to file the Company's Quarterly Report on Form 10-Q for the third quarter ended March 31, 2017 (the "Q3 2017 Form 10-Q") with the SEC.  The Q3 2017 Form 10-Q signed by Defendants C. Liang and Hideshima, made similar false and misleading statements concerning its financial results as contained in the April 27, 2017 press release, including that the Company had earned $0.32 EPS, had net income of $16,666,000 and made net sales of $631,124,000.

94.      The Company's Q3 2017 Form 10-Q also attached SOX certifications, signed by Defendants C. Liang and Hideshima, attesting that the financial statements were in compliance with GAAP and that the Company's disclosure controls and its internal controls over financial reporting were designed such that the controls were effective.  Further, the Q3 2017 Form 10-Q stated: "[t]he unaudited condensed consolidated financial statements included herein ***reflect all adjustments, including normal recurring adjustments, which are, in the opinion of management, necessary for a fair presentation of***

- 32 -

*the consolidated financial position, results of operations and cash flows for the periods presented*."

95.     Super Micro also disclosed in the Q3 2017 Form 10-Q that no changes had occurred concerning its critical accounting policies, including its revenue recognition policy, since its previous disclosure in its 2016 Form 10-K:

> *There have been no material changes in the matters for which we make critical accounting policies and estimates in the preparation of our Condensed Consolidated Financial Statements during the three and nine months ended March 31, 2017*, as compared to those disclosed in our Annual Report on Form 10- K for the fiscal year ended June 30, 2016.

96.     On July 20, 2017, after the close of trading, the Individual Defendants caused Super Micro to file a Current Report on Form 8-K which incorporated a press release titled "Super Micro Computer, Inc. Schedules Conference Call and Webcast for Fourth Quarter and Fiscal 2017 Financial Results Company to Report Preliminary Financial Results":

> *The Company now anticipates it will report revenue for its fourth quarter of fiscal 2017 in the range of $712 million to $717 million*. This compares to the Company's previous guidance range of $655 million to $715 million. Revenue exceeded expectations primarily due to stronger sales in Asia and at storage customers with strong shipments that accelerated late in the quarter.

> *The Company also anticipates its non-GAAP earnings per diluted share will be in a range of $0.35 to $0.37*. . . .

> "*While Supermicro exceeded revenue expectations with record high revenues due to growth in our Asia business as well as new storage customers*, earnings were lower than forecast. . . . We will provide more detail on the fourth quarter at the time of our earnings call," said Charles Liang, Chairman and Chief Executive Officer.

97.     On August 3, 2017, the Individual Defendants caused Super Micro to file a Current Report on Form 8-K with the SEC, which included a press release announcing its fourth quarter and fiscal year of 2017 financial results.  The press release stated that the Company's revenues of $718 million exceeded both its guidance of $655-$715 million, as well as consensus estimates of $709 million, and that EPS of $0.39 topped the Company's pre-announcement and consensus of $0.36.  In particular, the press release stated:

- ***Quarterly net sales of $717.9 million . . . .***

- ***GAAP net income of $17.1 million . . . .***

- ***GAAP gross margin was 13.5% . . . .***

*      *      *

***GAAP net income for the fourth quarter of fiscal year 2017 was $17.1 million or $0.33 per diluted share,*** an increase of 145.7% from net income of $7.0 million, or $0.13 per diluted share in the same period a year ago. Included in net income for the quarter is $5.1 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, ***non-GAAP net income for the fourth quarter was $20.7 million, or $0.39 per diluted share,*** compared to non-GAAP net income of $10.4 million, or $0.20 per diluted share, in the same quarter of the prior year.

*      *      *

***Net sales for the fiscal year ended June 30, 2017 were $2,529.9 million***, up 14.2% from $2,215.6 million for the fiscal year ended June 30, 2016. ***GAAP net income for fiscal year 2017 decreased to $69.3 million, or $1.34 per diluted share, a decrease of 3.7% from $72.0 million, or $1.39 per diluted share, for fiscal 2016.*** Included in net income for the fiscal year ended June 30, 2017 is $19.2 million of stock-based compensation expense (pre-tax). Excluding this item and the related tax effect, ***non-GAAP net income for the fiscal year 2017 was $82.8 million or $1.57 per diluted share, a decrease of 1.3% compared to $83.8 million or $1.59 per diluted share for fiscal year 2016.***

***Business Outlook & Management Commentary***

The Company expects net sales of $625 million to $685 million for the first quarter of fiscal year 2018 ending September 30, 2017. The Company expects non-GAAP earnings per diluted share of approximately $0.30 to $0.40 for the first quarter.

***"Supermicro has built a strong foundation for sustained high growth while improving profitability.*** During the last couple of years we have made significant investments in global production capacity, engineering, quality, global services, and systems and datacenter management software. It is these investments that will power the new Supermicro 3.0" said Charles Liang, Chairman and Chief Executive Officer. "Supermicro 3.0 positions us as the only Tier 1 IT Infrastructure Provider capable of both first to market product innovation and global scale, quality, services and support to engage our rapidly growing enterprise customer base deeply in their business requirements. ***The record high revenue and strong 27.6% second half growth over last year*** is a direct result of these Supermicro 3.0 investments. With the major investments in place and the new Skylake product portfolio shipping, future investment and expenses will begin to flatten driving improved profitability moving forward."

98.     The press release also reported on Super Micro's consolidated balance sheet as of June

- 34 -

30, 2017, including accounts receivable (net) of $483.4 million, inventories of $636 million, accrued liabilities of $80.4 million, and retained earnings of $515.3 million.

99.     On August 3, 2017, Super Micro held an earnings conference call where Defendant C. Liang touted the Company's revenues and strong momentum:

> *We finished the fiscal year 2017 with record revenue and strong momentum*. Super Micro 3.0 provides the foundation and product to take advantage of this cycle of technology transition. We believe that fiscal 2018 will be one of the strongest years in Super Micro's history.

100.     On August 29, 2017, the Individual Defendants caused Super Micro to file a Notification of Late Filing on Form 12b-25, signed by Defendant Hideshima, revealing that the Company could not meet the August 29, 2017 deadline to file its Annual Report on Form 10-K for fiscal year 2017.  Still, the Individual Defendants caused the Company to falsely reassure analysts and investors that it "will be filed on or before the fifteenth calendar day following the prescribed due date" *i.e.*, September 13, 2017. Specifically, the Form 12b-25 stated:

> *The subject annual report* . . . *on Form 10-K* . . . *will be filed on or before the fifteenth calendar day following the prescribed due date* . . . .
>
> *        *        *
>
> Super Micro Computer, Inc. (the "Company") is not in a position to file its Form 10-K for fiscal year ended June 30, 2017 (the "Form 10-K"), in a timely manner because the Registrant cannot complete the Form 10-K in a timely manner without unreasonable effort or expense. Additional time is needed for the Company to compile and analyze certain information and documentation and complete preparation of its financial statements in order to permit the Company's independent registered public accounting firm to complete its audit of the financial statements to be incorporated in the Form 10-K and complete its audit of the Company's internal controls over financial reporting as of June 30, 2017.

101.     On August 31, 2017, Maxim Group issued a report noting that the Company's repeated inability to timely file mandatory SEC disclosures was damaging "management's credibility" in the eyes of investors but – in light of the information made available at the time – it expected the delay to be "*innocuous*." The report stated:

*We expect better execution with respect to filing reports in a timely & accurate manner*. . . . We note a similar situation took place in 2015, when SMCI required a 15-day extension to file its FY15 10-K in connection to a certain employee's unadvised activity relating to sales and marketing, but ultimately did not impact financial results. Then in the following quarter (September 2015 quarter, F1Q16), management discovered some extended warranty revenue that should have been accounted for as deferred revenue, which delayed the 10-Q and led to a minor restatement of revenue (see our Nov-2015 note). While we expect the current delayed filing to prove innocuous as well, *we note that the recurring one-time nature of delayed filings are eroding management's credibility, based on our conversations with investors*. We believe management will make changes to ensure that delayed filings do not recur, albeit the delays have been for unique reasons.

102.     On September 14, 2017, the Individual Defendants caused Super Micro to issue a press release titled "Super Micro Computer, Inc. Announces Receipt of Non-Compliance Letter From Nasdaq." The following day, September 15, 2017, the Company filed a Current Report on Form 8-K disclosing the Company would not be able to meet the 15-day extension for filing the Form 10-K and that an Audit Committee review was underway, but nonetheless reassured analysts and investors that "*[t]he Company intends to file its 10-K promptly upon completion of the audit committee's review and the completion of the audit*."  Specifically, the Form 8-K stated:

On September 14, 2017, Super Micro Computer, Inc. (the "Company") received a notification letter (the "Letter") from the Listing Qualifications Department of the NASDAQ Stock Market LLC ("NASDAQ") indicating that the Company is not in compliance with NASDAQ Listing Rule 5250(c)(1), as a result of the Company's delay in filing its Annual Report on Form 10-K for fiscal year 2017 (the "Form 10- K"). *The Form 10-K was due on August 29, 2017. The Company filed a Form 12b-25 on August 29, 2017, the effect of which was to extend the due date for the Form 10-K to September 13, 2017. The Company was unable to file the Form 10- K by September 13, 2017, for the reasons reported in the Form 12b-25 and further described below*. The Letter has no immediate effect on the listing or trading of the Company's common stock on the NASDAQ Global Select Market. The Letter stated that, under NASDAQ rules, the Company has 60 calendar days to regain compliance or to submit a plan to do so, and that if a plan is submitted and accepted, NASDAQ could grant the Company an exception of up to 180 calendar days from the filing's due date to regain compliance. If NASDAQ does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a NASDAQ hearings panel.

As previously disclosed by the Company, additional time is needed for the Company to compile and analyze certain information and documentation and finalize its financial statements, *as well as complete a related audit committee review*, in order to permit the Company's independent registered public accounting firm to complete its audit of the financial statements to be incorporated in the Form 10-K and complete its audit of the

Company's internal controls over financial reporting as of June 30, 2017. The Company is unable at this time to provide a date as to when the review and the audits will be completed. The Company intends to file its 10-K promptly upon completion of the audit committee's review and the completion of the audit.

### The Truth Begins to Emerge

103.     On October 26, 2017, the truth behind the Company's financial condition and the Individual Defendants' wrongdoing slowly began to emerge.  That day, Super Micro filed a Current Report on Form 8-K with the SEC, which incorporated a press release announcing revenue, income, and earnings figures for the first quarter of 2018.  For the first time, the Company disclosed details of improper revenue recognition specifically related to a sales transaction originally recorded as revenue during the second quarter of 2017 (the period ending December 31, 2016), later reversed and recognized in the third quarter (the period ending March 31, 2017). Due to this inappropriate transaction, the Audit Committee initiated an independent investigation to assess whether similar transactions existed and were properly accounted for.

104.     Specifically, the press release stated:

In connection with the in-process audit of the Company's financial results for the year ended June 30, 2017, a sales transaction was subject to additional inquiry and review. ***The transaction in question was originally recorded as revenue during the quarter ended December 31, 2016***. However, prior to review by the Company's independent auditors and prior to the Company's public announcement of its results for the quarter, ***the recognition of revenue was reversed and the revenue was subsequently recognized in the quarter ended March 31, 2017***. ***When the audit committee was made aware of this transaction, the Audit Committee of the Company's Board of Directors initiated an independent investigation to determine whether there were any similar transactions and if so, whether such transactions were properly accounted for***. ***Due to the volume of data to be reviewed to complete the investigation, the Company was unable to file its Form 10-K on a timely basis***.

The Company is unable at this time to provide a date as to when the investigation and the 2017 audits will be completed or predict the possible outcome of the investigation.

105.     In the October 26, 2017 press release, Super Micro also claimed that it would take the necessary steps "as soon as practicable" to achieve compliance with NASDAQ listing requirements:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Super Micro announced on September 14, 2017 that it received a notification letter from Nasdaq stating that the Company is not in compliance with Nasdaq listing rule 5250(c)(1), which requires timely filing of reports with the U.S. Securities and Exchange Commission....

The Nasdaq notice has no immediate effect on the listing or trading of the Company's common stock on the Nasdaq Global Select Market. Under the Nasdaq rules, the Company has 60 days from the date of the notice either to file the Form 10-K or to submit a plan to Nasdaq to regain compliance with Nasdaq's listing rules. The Company intends to submit a plan within the required time period and if the plan accepted, the Company could be granted up to 180 days from the Form 10- K's due date to regain compliance. If NASDAQ does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a NASDAQ hearings panel.

***Super Micro intends to take all necessary steps to achieve compliance with the NASDAQ continued listing requirements as soon as practicable***.

106.    Noticeably absent from the October 26, 2017 related earnings conference call was Defendant Hideshima, who had participated in all prior earnings conference calls during the Relevant Period.  When asked about the CFO's status, Hayes stated he was "working very hard on the issues." Defendant Hideshima would "resign" from the Company three months later.

107.    During the October 26, 2017 earnings conference call, Hayes reiterated that the Company needed additional time to compile and analyze materials and finalize its financial statements, as was reported in prior press releases.  Hayes refused to answer several questions concerning the Company's delinquent reports and ongoing Audit Committee investigation and misleadingly downplayed the delay

[Analyst]: Just for a clarification point, reading through the release today and kind of going back to the delay that we're incurring here on the 10-K. To be clear, what's being evaluated by the audit committee isn't whether or not the revenues were real, but rather not the documentation around which period the revenues were recognized, is that the case?

[Hayes]: Brian, as indicated, we're not going to answer any questions related to the filing of the 10-K.

*       *       *

[Analyst]: Okay. And the reason why there's more uncertainty around what channel was as a % of revenue is that that's where the uncertainty resides with the one revenue recognition. Should be getting done. Is that a correct interpretation?

[Hayes]: Again, Nehal, we're not going to discuss anything related to the 10-K filing.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

*        *        *

[Analyst] Okay. And then other than the efforts going on surrounding the review here with the 10-K, has there been any structural changes that would affect the operating expenses of the company outside of normal business operations?

[Hayes]: *No. Everything is pretty much the same . . . everything is on track*.

108.    On this news, Super Micro's stock price fell $1.22 per share on October 27, 2017, to close at $20.48 per share compared to the previous trading day's closing of $21.70 per share, erasing $59 million in market capitalization in a single day.

109.    On October 27, 2017, Susquehanna Financial Group issued a report titled "Super Micro: Audit Review To Remain Overhang On Shares; Gross Margins Remain Constrained," noting the overhang on the Company's stock price due to questions concerning its revenue recognition processes and delinquent reports.  Specifically, the report stated:

> *The audit investigation of SMCI's revenue recognition practices (and associated delay in 10-K filing) is expected to remain an overhang on shares*, while the fundamental backdrop remains mired by a lack of Gross Margin expansion. Maintain Neutral rating.
>
> The delay in 10-K filing associated with a review of revenue recognition practices is likely to remain an overhang on shares until this is resolved and the company has adequately addressed its internal controls. . . .
>
> Audit committee investigation to remain an overhang, unclear when this will be resolved. *SMCI indicated that the reason its 10-K had been delayed was due to an investigation into revenue recognition practices around revenue that was originally recognized in the Dec Q'16 and then reversed and recognized in Mar Q'17*. This has resulted in a more thorough review of sales recognition practices. SMCI did not provide any insight into when this matter would be resolved.

110.    On November 13, 2017, after the close of trading, Super Micro filed a Notification of Late Filing on Form 12b-25, signed by Defendant Hideshima, disclosing that it could not timely file its Quarterly Report on Form 10-Q for the first quarter of 2018.  Specifically, the Form 12b-25 stated:

> As previously announced, the Company has been unable to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "Form 10-K") pending the completion of an independent investigation by the Audit Committee of the Company's Board of Directors and any additional work required thereafter in order for the Company to finalize its

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

financial statements and have the Company's independent registered public accounting firm complete its audit of the financial statements to be incorporated in the Form 10-K and complete its audit of the Company's internal controls over financial reporting as of June 30, 2017. The Form 10-Q cannot be completed and filed until the Form 10-K is completed and filed. The Company does not expect the filing to be made within the time period required for a timely filing pursuant to Rule 12b-25(b) under the Securities Exchange Act of 1934.

111.    On November 20, 2017, after the close of trading, the Individual Defendants caused Super Micro to file a Current Report on Form 8-K incorporating a press release titled "Super Micro Computer Inc. Announces Receipt of Non-Compliance Letter from Nasdaq."  Specifically, the Form 8-K stated:

> On November 16, 2017, Super Micro Computer, Inc. (the "Company") received a notification letter (the "Letter") from the Listing Qualifications Department of the NASDAQ Stock Market LLC ("NASDAQ") *indicating that the Company is not in compliance with NASDAQ Listing Rule 5250(c)(1)*, as a result of the Company's delay in filing its Quarterly Report on Form 10-Q for the period ended September 30, 2017 and its continued delay in filing its Annual Report on Form 10-K for the period ending June 30, 2017 (the "Form 10-K"). The Company previously submitted a plan of compliance to Nasdaq on November 10, 2017 (the "Plan") with respect to its delay in filing the Form 10-K (the "Initial Delinquent Filing"). *Upon review of the Company's Plan and in connection with this additional delinquency, the Letter requires that the Company submit an update to the Plan by November 30, 2017* (the "Revised Plan"). The Letter has no immediate effect on the listing or trading of the Company's common stock on the NASDAQ Global Select Market. If the Revised Plan is submitted and accepted, the Company could be granted up to 180 days from the due date of the Initial Delinquent Filing, or March 12, 2018, to regain compliance. If NASDAQ does not accept the Company's plan, then the Company will have the opportunity to appeal that decision to a NASDAQ hearings panel.

112.    On January 30, 2018, the Individual Defendants caused Super Micro to file a Current Report on Form 8-K incorporating two press releases, one titled "Super Micro® Announces Second Quarter Fiscal 2018 Preliminary Financial Information; Management Changes," and another titled "Super Micro® Announces the Appointment of Kevin Bauer as Chief Financial Officer," disclosing that three senior management level employees, including Defendants Hideshima and Liaw, had departed effective immediately and that the Company had appointed Kevin Bauer ("Bauer") as the new CFO.  Specifically, the Form 8-K stated:

> The Company announced the appointment of Kevin Bauer, as the Company's Senior Vice President and Chief Financial Officer ("CFO"), effective January 30, 2018. Mr. Bauer, 58,

has served as the Company's Senior Vice President, Corporate Development and Strategy since January 2017.

*     *     *

***The Company also announced that Wally Liaw, Sr. Vice President of International Sales, Phidias Chou, Sr. Vice President, Worldwide Sales and Howard Hideshima, Senior Vice President and Chief Financial Officer, have resigned, effective January 30, 2018. Mr. Liaw has also resigned as a member of the Board of Directors of the Company (the "Board"), effective January 30, 2018.***

113.     In addition to providing preliminary financial results for the second quarter of 2018, the January 30, 2018 press release also revealed for the first time that the Audit Committee had finished its investigation, but that further investigation was necessary and the Company could not represent that its historical financial statements were accurate.  The Company reiterated that it had no completion date for its investigation or delinquent reports:

> ***Additional time is required to analyze the impact, if any, of the results of the investigation on the Company's historical financial statements, as well as to conduct additional reviews*** before the Company will be able to finalize its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "Form 10-K"). ***The Company is unable at this time to provide a date as to when the Form 10-K will be filed or to determine whether the Company's historical financial statements will be adjusted or, if so, the amount of any such adjustment(s) and what periods any such adjustments may impact***. The Company intends to file its Quarterly Reports on Form 10-Q for the quarters ended September 30 and December 31, 2017 promptly after filing the Form 10-K.

114.     On January 30, 2018, the Company held an earnings conference call which was attended by Hayes, Bauer, and Defendant C. Liang, addressing the Company second quarter of 2018 earnings (which were not filed with the SEC) and to introduce new members of management.  Hayes and Defendant C. Liang refused to discuss the departures of Defendants Hideshima or Liaw, because of their connection to the Audit Committee investigation:

> [Analyst:] The management resignations that you outlined in the press release, how do we – especially related to the sales leadership, how do we think about those relative to the audit that was just completed? Are those related, are those separate? And then, how do we think about your ability to forecast revenue kind of going forward?

[Hayes:] [A]s you know, we said that we wouldn't comment on the Audit Committee investigation and the delayed financing K. And definitely, we're not at liberty to discuss anything related to the Audit Committee, so I'm going to have to decline your question on that.

115.     On these further disclosures and developments, the price of Super Micro's common stock declined from its close of $24.65 per share on January 30, 2018, to a close at $22.83 per share on January 31, 2018, erasing another $260 million in market capitalization, or 21.7%, in just four trading days.

116.     On February 9, 2018, after the close of trading, Super Micro filed a Notification of Late Filing on Form 12b-25, signed by Bauer, disclosing it could not file its Quarterly Report Form 10-Q for the second quarter of 2018 and repeated the Company's prior disclosures that it could not determine when the investigation would be completed, its impact on the Company's historical financial statements or when it would become current with its SEC filings.

117.     On February 20, 2018, after the close of trading, Super Micro filed a Current Report on Form 8-K incorporating a press release titled "Super Micro Computer Inc. Announces Receipt of Non-Compliance Letter from Nasdaq," disclosing that the Company was not in compliance with NASDAQ listing rules due to failure to file its second quarter Quarterly Report on Form 10-Q with the SEC and that it had until February 28, 2018, to submit a revised plan to regain compliance.  The Company also repeated that the Audit Committee had completed its investigation but that it needed additional time to analyze any impact on the Company's historical financial statements and conduct additional reviews prior to filing its 2017 Form 10-K.

**Super Micro is Delisted from NASDAQ and Announces Need to Restate Fiscal Year 2015 to Fiscal Year 2017**

118.     On March 16, 2018, the Individual Defendants caused Super Micro to file a Current Report on Form 8-K incorporating a press release titled "Super Micro® Receives Nasdaq Staff Determination Letter; Has Requested Hearing Before Hearings Panel," disclosing that its stock was subject to delisting by NASDAQ:

On March 14, 2018, Super Micro Computer, Inc. (the "Company") received a letter from the staff of the Listing Qualifications Department (the "Staff") of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Company that since the Company had not filed its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 and its Quarterly Reports on Form 10-Q for the quarterly periods ended September 30, 2017 and December 31, 2017 (collectively, the "Delinquent Filings") by March 13, 2018, the deadline by which the Company was to file its Delinquent Filings in order to regain compliance with Nasdaq Listing Rule 5250(c)(1), the Company's common stock is subject to delisting from Nasdaq. The letter further noted that, unless the Company requested an appeal of the Staff's determination, trading of the Company's common stock on Nasdaq would be suspended at the opening of business on March 23, 2018, and a Form 25-NSE would be filed with the SEC removing the Company's securities from listing and registration on Nasdaq.

On March 16, 2018, the Company submitted a letter to Nasdaq requesting a hearing before a Hearings Panel at which it intends to present its plan to regain and thereafter maintain compliance with all applicable listing requirements. In connection with its request for a hearing, the Company has also requested a stay of the suspension of trading and delisting of its common stock, pending the hearing and decision of the Hearings Panel. The Hearings Panel will notify the Company of its decision to allow the Company to continue to trade on Nasdaq pending the hearing and a decision by the Hearings Panel by April 5, 2018. There can be no assurance that the Hearings Panel will grant the Company's request for continued listing or stay the delisting of its common stock.

119.   On May 3, 2018, after the close of trading, the Individual Defendants caused Super Micro to filed a Current Report on Form 8-K incorporating a press release titled "Super Micro® Announces Third Quarter Fiscal 2018 Preliminary Financial Information."  In addition to preliminary third quarter 2018 results, the press release also disclosed that the additional testing overseen by the Audit Committee was "nearing completion."

120.   Additionally, on May 3, 2018 Super Micro held an earnings conference call during which Bauer and Hayes both spoke.  Hayes downplayed the internal control issues and stated that the Audit Committee's additional investigation was nearing completion.

121.   Also during the May 3, 2018 earnings conference call, Bauer stated that Super Micro would not answer any questions concerning the delinquent reports.

122.   On May 10, 2018, after the close of trading, Super Micro filed a Notification of Late Filing on Form 12b-25, signed by Bauer, disclosing that it could not timely complete its Quarterly Report on Form 10-Q for the third quarter of 2018.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

123.    On May 21, 2018, Super Micro filed a Current Report on Form 8-K, signed by Bauer, disclosing that it had received a letter from NASDAQ detailing additional delinquencies with listing rules but that it remained "on track" to meet the August 24, 2018 deadline.

124.    On July 13, 2018, after the close of trading, Super Micro filed a Current Report on Form 8-K, disclosing that the Company had failed to hold a required annual meeting of shareholders.

125.    On August 21, 2018, after the close of trading, Super Micro filed a Current Report on Form 8-K, disclosing that its SEC filings dating back to the Company's 2017 Form 10-K would remain delinquent, and as such, the Company would face delisting proceedings:

> On August 20, 2018, Super Micro Computer, Inc. (the "Company") submitted a supplemental letter to the Hearings Panel (the "Panel") of The Nasdaq Stock Market LLC ("Nasdaq") notifying the Panel that **the Company will be unable to meet the Panel's August 24, 2018 deadline to regain compliance with Nasdaq Listing Rule 5250(c)(1)** because the Company will not be able to complete and file its Annual Report on Form 10-K for its fiscal year ended June 30, 2017 (the "2017 Form 10-K") and its Quarterly Reports on Form 10-Q for its fiscal quarters ended September 30, 2017, December 31, 2017 and March 31, 2018 (collectively with the 2017 Form 10-K, the "Delinquent Reports") with the Securities and Exchange Commission ("SEC") by such date.

> As previously disclosed, by decision dated May 9, 2018, the Panel granted the Company's request to continue its listing on Nasdaq's Global Select Market through August 24, 2018, subject to the condition that the Company become current with its SEC filings by that date and informs the Panel the Company is current with such filings. **While the Company has made significant progress toward completing the necessary accounting review processes, it has determined that the Delinquent Reports will not be filed with the SEC by August 24, 2018**.

> **As a result of the updated timing, the Company expects that its common stock will soon be suspended from trading on Nasdaq's Global Select Market and the Panel will begin delisting proceedings**.

126.    The August 20, 2018 Form 8-K incorporated a press release disclosing the Company would not file its delinquent reports with the SEC given the magnitude of transactions that needed to be reviewed for revenue recognition purposes and reiterated that it expected to be delisted from the NASDAQ.

127.    Later that day, Super Micro held an earnings conference call where Bauer and Defendant

C. Liang disclosed that the Company still had a substantial amount of transactions to review for revenue

recognition purposes and reiterated that its stock would be suspended from trading on the NASDAQ.

Specifically, Bauer stated:

We have worked diligently and deployed significant resources towards completing the 2017 and 2018 financial statements, but are not able to file by the deadline of August 24, 2018. . . .

We have made tremendous progress on this matter, having completed the analysis of specific revenue transactions identified through our audit committee's investigation.

To-date, our cash flows have not been impacted by our findings and no transaction reviewed by the company as part of this process has involved revenue that could not ultimately be recognized nor have we concluded that a restatement of financial results is necessary. *The question you must be asking is; why is this matter taking so long*. *The answer is that in order to be thorough, we are reviewing transactions near the end of each quarter for similar issues found in the earlier testing, but particularly as it relates to the matching of purchase order and shipping terms to the timing of revenue*.

As we are a high-volume business, this entails locating documentation that is onsite, archived, or [ph] at third-parties. *I'm reviewing thousands of revenue transactions in detail using a structured approach*. *There are a number of issues*. However, let me share an example of an issue that has arisen in our reviews.

We have from time to time offered free shipping to customers even though terms of our agreements with those customers provided that the customer would arrange for its own shipping company to pick the products up at our factory shipping dock. *This practice had the unintended accounting consequence of converting the transaction from an Ex Works transaction to an FOB transaction*. *If end-of- quarter shipments are adjusted in this way, it can cause the appropriate date for recognizing the revenue for those shipments to slip from one quarter into the next*. *This is one example of what we are looking for as we review thousands of transactions*.

The company believes the revenue recognized for review transactions is valid revenue. *The main issue is the quarter in which revenue must be recognized. We have not yet determined whether the magnitude of any timing adjustment will be material to any of our previously filed financial statements*.

We continue to work diligently to complete the review, assess the impact, and complete our financial statements and assessment of internal controls over financial reporting. *We have engaged KPMG to assist us with our review* and we are also working closely with our independent auditor, Deloitte, to complete the job. We appreciate the efforts of both KPMG and Deloitte.

- 45 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

*… We are not able today to project the date by which we will complete this review and file all our delinquent SEC reports, but we believe that date is not too far in the future*.

128.   On August 21, 2018, during the Company's fourth quarter of 2018 earnings conference call, analysts recognized that the Company's stock price was declining in rection to the multiple delayed SEC filings, and noted that the Company had disclosed that significant work remained to be done in connection with the delinquent reports. One analyst stated:

*But, Kevin, as you know, the stock is reacting to delayed filing* and really great color on some of the examples that's going on. You made a statement at the end that you believe that the ability to [ph] solve these problems is not too far away, but in the second press release of the day it does say that there is still significant work to do. So can you help bridge the delta between the verbal comment and what's in the file – in what's the 8-K?

129.   In response, Bauer admitted that the Company still had a substantial amount of work remaining, possessed "pretty good visibility" on completing the process, had analyzed the largest transactions first and was just now moving toward assessing smaller transactions.   Specifically, the following exchange took place:

[Bauer]: Yeah. So I think it is true that *we still have a substantial amount of work to do*. I think what we said in terms of being able to see it in the future is that *now that we are later in the process we actually have pretty good visibility on what it takes to remain to be able to complete the process*. So that's how I would string them together that it's one of better visibility, but there's still a fair amount to do.

[Analyst]: Okay. *So the process that was defined on what needs to be done to review a transaction was established relatively late relative to when the investigation started about a year ago*. Is that fair to say?
[Bauer]: *Well, certainly, as the results of the investigation came in, we were able to see a little bit more in terms of the processes that we [ph] would needing . . . to do*. *So certainly it was evolving*.

[Analyst]: Okay. And just to be clear, you said significant transactions left for review, but you've already reviewed hundreds of transactions. So are you only a fraction of the way through? Are you like 10% to 20% the way through or are you more like 80%, 90% the way through of what needs to be reviewed?

[Bauer]: Yeah. We really can't go into that level of detail. *What I can share with you is that we've taken the approach of largest transactions and are now going towards smaller transactions*.

130.   On August 21, 2018, Wells Fargo issued a report titled "SMCI: Suspension of Coverage," disclosing that Wells Fargo was suspending research coverage in light of Super Micro's failure to meet SEC filing deadlines and the risk of NASDAQ delisting.

131.   Then, on August 22, 2018, Susquehanna Financial Group issued a report titled "Super Micro: Suspending Coverage," disclosing that it was suspending coverage of its ratings and estimates due to Super Micro's failure to meet SEC filing deadlines and NASDAQ listing standards.  Specifically, the report stated:

> Why is it taking the company so long to complete the reviews: SMIC [sic] disclosed last night that its cash flows have not been impacted by the on-going investigation, and there is no need for restatement of financial results. However, *SMCI is still reviewing transactions near the end of each quarter for similar issues found in the earlier reviews, but particularly as it relates to the matching of purchase order and shipping terms to the timing of revenue. In our view, lack of proper internal controls has lengthened this review process. Yes, there is no restatement, but lack of proper internal controls has also made it difficult for the company to provide necessary documentation for the past transactions which is consequently [sic] making it difficult for the company to determine the timing of revenue recognition.*

132.   On August 22, 2018, CFRA issued a report detailing concerns about Super Micro's failure to meet SEC filing deadlines and anticipated NASDAQ delisting.  Specifically, the report stated:

> *We are growing wary after SMCI states it has been unable to complete the analysis of specific revenue transactions found through its audit committee's investigation. We expect SMCI to be delisted from the Nasdaq Exchange given its inability to properly file SEC required documents.*
>
> *          *          *
>
> *We remain concerned about the timetable as well as necessary costs it will take for SMCI to complete its review, as the company still noted a substantial amount of transactions that need to be reviewed.*
>
> *          *          *
>
> Our 12-month target price of $20 is based on a P/E of 7.7X our FY 19 operating EPS estimate, below comparable peers *to reflect limited visibility surrounding accounting issues.*

133.   On August 23, 2018, Super Micro issued a press release titled "Super micro® Announces

Suspension of Trading of Common Stock on Nasdaq and Its Intention to Appeal."  The press release revealed that the Company anticipated its stock suspension from trading on NASDAQ.

134.    Super Micro filed a Current Report on Form 8-K, disclosing the NASDAQ Hearing Panel had delisted the Company's common stock and suspend trading on NASDAQ as of August 23, 2018. Super Micro indicated that it intended to appeal.

135.    On August 29, 2018, after the close of trading, Super Micro filed a Notification of Late Filing on Form 12b-25. In particular, the Form 12b-25 stated:

> Super Micro Computer, Inc. (the "Company") is unable to file its Annual Report on Form 10-K for fiscal year ended June 30, 2018 (the "2018 Form 10-K") in a timely manner without unreasonable effort or expense. As previously announced, the Company has been unable to file its Annual Report on Form 10-K for the fiscal year ended June 30, 2017 (the "2017 Form 10-K"), Quarterly Report on Form 10- Q for the quarter ended September 30, 2017 ("Q1 10-Q"), Quarterly Report on Form 10-Q for the quarter ended December 31, 2017 ("Q2 10-Q") and Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 ("Q3 10-Q") (the 2017 Form 10-K, Q1 10-Q, Q2 10-Q, Q3 10-Q and the 2018 Form 10-K being collectively referred to herein as the "Delinquent Reports"). The Audit Committee of the Company's Board of Directors has completed the previously disclosed investigation. The Company is currently in the process of preparing its financial statements in light of the results of the Audit Committee investigation and other ongoing testing. *A significant number of transactions remain to be reviewed*.
>
> *The delay primarily relates to the magnitude of work that the Company still must perform in order to review the Company's accounting judgments, estimates and records for transactions that occurred during fiscal years 2015 through 2017, as well as the Company's assessment and conclusions on the effectiveness of its internal control over financial reporting during such periods, so that it can complete the financial statements for the 2017 Form 10-K and subsequently complete the other delinquent reports*. Although the Company has made substantial progress in these matters and committed extraordinary resources and personnel toward the effort, the amount of work is substantial and the additional testing required has taken longer than anticipated.

**The Company Announces the Material Weaknesses and the Need to Restate Financial Statements, and Continues to Minimize Its Accounting Misconduct**

136.    On November 15, 2018, Super Micro filed a Current Report on Form 8-K (the "Restatement Announcement") that disclosed the need to restate its financials for each of the quarterly and annual periods during fiscal years 2015 and 2016, the first three quarters of fiscal years 2017, and the fourth quarter preliminary results.  Super Micro also announced material weaknesses in internal controls

and ineffective disclosure controls, as well as remediation efforts taken to date.   Specifically, the

Restatement Announcement stated:

> **Item 4.02(a) Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review**
>
> On November 14, 2018, the Board of Directors of the Company, based on the recommendation of the Audit Committee and in consultation with management, determined that (i) *the Company's consolidated financial statements and the related reports of its independent registered public accounting firm contained in its Annual Report on Form 10-K for the fiscal years ended June 30, 2016 and 2015, (ii) the Company's previously issued condensed consolidated financial statements contained in its Quarterly Reports on Form 10-Q for the interim quarterly periods for the previously mentioned fiscal years ended June 30, 2016 and 2015 and (iii) the Company's previously issued condensed consolidated financial statements contained in its Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2017, December 31, 2016 and September 30, 2016 should no longer be relied upon because of errors. The errors primarily related to the timing of recognition of revenue and classification of certain inventory used for engineering purposes and certain products returned to the Company for repair as inventory. Revenue recognition timing issues included quarter-end cut-off determinations and allocation of revenue determinations for customer contracts with service elements.*
>
> *      *      *
>
> ***The Company intends to restate its financial statements for prior periods as required.*** The Company's preliminary estimates for the changes in revenue, net income and GAAP earnings per share for the fiscal years ended June 30, 2015 and 2016 (as contained in the Company's Annual Reports on Form 10-K filed with the Securities and Exchange Commission (the "SEC") on September 10, 2015 and August 26, 2016, respectively) and the fiscal year ended June 30, 2017 (as announced on a preliminary basis in an exhibit to the Company's Current Report on Form 8-K furnished on August 3, 2017) resulting from the expected restatement is as set forth below (in millions, except per share amounts).
>
> *      *      *
>
> In addition, the Company is evaluating the impact of the identified errors on its internal control over financial reporting and disclosure controls and procedures. ***The Company will report material weaknesses in internal control over financial reporting related to this matter and will report that its disclosure controls and procedures were ineffective***.

137.     In the Restatement Announcement, Super Micro reported the preliminary estimated

restatement impact on its revenues, net income and diluted EPS for the fiscal years ended June 30, 2015,

June 30, 2016 and June 30, 2017.  Using the mid-point estimate from the "Expected Adjustment Range,"

Super Micro over a three-year cumulative period overstated revenues by $60 million, net income by $8.5 million and EPS by $0.16, however the Company would later concede that two additional years of historical statements were also inaccurate.

138.    The Restatement Announcement also noted the Company's intention to restate the non-GAAP EPS amounts that it previously disclosed for prior periods in its quarterly earnings releases. Using the mid-point estimate, Super Micro over a three-year cumulative period overstated non-GAAP EPS by $0.13, however the Company would later concede that two additional years of historical statements were also inaccurate.

139.    The Company also issued a press release the same day titled "Supermicro® Announces First Quarter Fiscal 2019 Preliminary Financial Information and Decision to Restate Prior Period Financial Statements," which discussed the need for restatement and continued testing:

> Also today, the Company filed a Current Report on Form 8-K with the Securities and Exchange Commission noting that on November 14, 2018, the Board of Directors of the Company, based on the recommendation of the Audit Committee and in consultation with management, determined to restate prior period financial statements and advised that those financial statements should not be relied upon. The restatement primarily relates to the timing of recognition of revenue and classification of certain inventory. The Company believes total cash flows from operating, investing, and financing have not been affected with the exception of certain balance sheet classification errors that have been determined to have an immaterial effect on cash and cash flows from operations. Investors are encouraged to review that report. Included in the Form 8-K are the Company's preliminary estimates for the changes in revenue, net income, GAAP diluted earnings per share and non-GAAP diluted earnings per share for the fiscal years ended June 30, 2015 and 2016 (as reported) and fiscal year ended June 30, 2017 (as announced).

140.    On November 15, 2018, the Company held an earnings conference call in which it discussed the Restatement and elaborated on steps taken to remediate certain material weaknesses. Specifically, Bauer stated:

> Now, let's turn to the progress we are making on the fiscal 2017 Form 10-K. The company has substantially completed its testing and assessments. Today, we announced that we have determined to restate prior period financials and provided estimated adjusted amounts. We are in the final stages of preparation and conclusion, so that we may continue to work with our auditors to complete our 2017 Form 10-K. *The core basis of the restatements remains the timing of revenue recognition.* Based on our assessment to date, the company confirms

that, although in our restated financials some revenue recognized in prior periods will be recognized in a subsequent period, all revenue from customer transactions in the period subject to the restatement is valid revenue. . . . *During our review of prior periods, we also discovered additional errors relating to the classification of certain inventories*.

*The number and breadth of the adjustments, coupled with their aggregate magnitude was significant enough for us to conclude that restating prior periods was necessary.* To date, we believe total cash flows from operating, investing and financing have not been impacted with the exception of certain balance sheet classification errors that have been determined to have an immaterial effect on cash and cash flow from operations.. . .

*Based on our findings, we expect to report material weaknesses of our financial reporting*. We have, depending on the matter, begun remediation measures to arying degrees. Along the way, *we have developed stronger revenue policies, trained employees, and developed new standards*.

There are a number of remediation efforts. Let me share a few examples. *We have hired senior revenue talent and grown our revenue team, implemented strong cut-off controls including locking the shipping dock at the close of the quarter and enhancing our revenue testing, and we have revamped the sales sub- certification process at quarter end*. In addition, we have formed a new internal audit team that is conducting testing on the second half of 2018 and absorbing the transfer of knowledge from the efforts of our advisors in the process.

141.   On May 17, 2019, Super Micro filed its delayed 2017 Form 10-K as well as its amendments to the Q1 2017 Form 10-Q, Q2 2017 Form 10-Q, Q3 2017 Form 10-Q, and Q3 2017 Form 10-Q.  The 2017 Form 10-K restated Super Micro's: (i) fiscal year 2016 balance sheet and related statements of operations, income and equity and cash flows for fiscal 2015 and fiscal 2016; (ii) selected financial data for fiscal 2015 and fiscal 2016; (iii) management's discussion and analysis of financial condition and results of operations for fiscal 2015 and fiscal 2016; and (iv) quarterly financial information for the fourth quarter of 2016.  The 2017 Form 10-K also reported "Adjustments" for fiscal 2013 and fiscal 2014.

142.   Super Micro's 2017 Form 10-K stated that the Company's internal controls over financial reporting and disclosure controls were ineffective due to material weaknesses.  Specifically, the 2017 Form 10-K stated:

*We have concluded that our internal control over financial reporting was not effective as of June 30, 2017 due to the existence of material weaknesses in such controls, and we*

*have also concluded that our disclosure controls and procedures were not effective as of June 30, 2017 due to material weaknesses in our internal control over financial reporting* . . . .

143.    Super Micro described the material weaknesses related to principles associated with the control environment.   In addition, Defendants admitted that Super Micro, including officers and managers, had awareness, engaged or condoned in specific fraudulent and deliberate conduct to prematurely recognize revenue, including but not limited to "altering source documents related to . . . sales transactions," and "failing to disclose or obscuring material facts about sales transactions." Specifically, 2017 Form 10-K stated in relevant part:

*We had a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance. Senior management did not establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire Company. The Company did not sufficiently promote, monitor or enforce adherence to the Code of Conduct. In the pursuit of quarterly revenue, certain of our sales, finance and operations personnel, including officers and managers, were aware of, condoned or were involved in actions that reflected an inappropriate tone at the top, that violated our Code of Conduct and our accounting policies and procedures, and that were inconsistent with a commitment to integrity and ethical values. These actions included (i) shipping products in advance of customer requested delivery dates, (ii) shipping products to storage facilities at the end of a quarter for later delivery to customers, (iii) in certain cases entering into side agreements with customers, (iv) in certain cases, shipping products before manufacturing was completed, (v) altering source documents related to some sales transactions and (vi) failing to disclose or obscuring material facts about sales transactions. As a result of those actions, we recognized revenue from numerous sales transactions in the incorrect period, although these valid sales transactions were recognized in one or more subsequent quarters in the aforementioned restatement. Some employees, including officers and managers, also failed to raise issues with material accounting consequences to the Audit Committee and our external auditors, and with respect to one transaction, appear to have attempted to minimize material facts about a sales transaction to, or obscure those facts from, the Audit Committee and our external auditors. Finally, we did not, on a consistent basis, (i) timely and thoroughly detect and address failures to comply with the Code of Conduct and (ii) train employees adequately to identify and report issues to management and the Audit Committee.*

*The Company did not maintain a sufficient complement of management, accounting, financial reporting, sales, operations, engineering and information technology personnel* who had appropriate levels of knowledge, experience, and training in accounting and internal control matters commensurate with the nature, growth and complexity of our business. The lack of sufficient appropriately skilled and trained personnel contributed to our failure to (i) adequately identify potential risks, (ii) include in the scope of our internal controls framework certain systems relevant to financial reporting and the preparation of

our consolidated financial statements, (iii) design and implement certain risk-mitigating internal controls and (iv) consistently operate certain of our internal controls. The lack of sufficient appropriately skilled and trained personnel also contributed to deficiencies in establishing and maintaining policies and procedures, establishing and enforcing standards for maintaining documents for revenue recognition purposes and establishing accountability for internal controls across the entire Company.

144.    The 2017 Form 10-K identified material weaknesses in connection with revenue recognition accounting, stating in relevant part:

> ***The Company identified deficiencies in revenue recognition accounting controls that resulted in material errors constituting material weaknesses, either individually or in the aggregate, as the Company did not appropriately design, or effectively operate, internal controls over certain aspects of accurate recording, presentation, and disclosure of revenue and related costs.*** The following were contributing factors to the material weaknesses in revenue recognition accounting:
>
> * The Company's internal controls did not consistently identify and properly account for key non-standard contract or arrangement terms for sales transactions that involved multiple elements (such as when the price of a system includes an extended warranty period and/or the Company's agreement to provide services to its customer). Specifically, the Company's internal controls failed to identify, accumulate and assess the accounting impact of situations in which they recognized revenue before all the elements necessary to establish "delivery" had occurred.
>
> * With respect to sales transactions near quarter-end, the Company's internal controls failed to consistently identify transactions where the terms of the sales arrangements with its customers were not properly documented in a form that fully reflected the final understanding between the parties as to the specific nature and terms of the agreed-upon transaction.
>
> * The Company's internal controls failed to consistently identify, resolve, document in its accounting system and allow for proper accounting where there were inconsistencies among the various documents underlying its sales transactions, and the Company did not always communicate the existence or resolution of those inconsistencies to its accounting organization to enable the proper recognition of revenue.
>
> * The Company lacked a control to ensure a consistent approach for reviewing its pricing and establishing supportable estimates of best estimated selling prices in allocating revenue between multiple elements. Consequently, the Company did not always correctly calculate the portions of the total revenue recognized from sales transactions allocated among the various elements.

145.    Under Note 19, "Restatement of Previously Issued Consolidated Financial Statements," the 2017 Form 10-K stated the following:

During the course of the Investigation, the further procedures by outside counsel and the management analysis (collectively, the "Investigation, Procedures and Analysis"), *the Audit Committee and management determined certain employees had violated the Company's Code of Business Conduct and Ethics and discovered accounting and financial reporting errors and certain irregularities.* On November 14, 2018, the Board, upon the recommendation, and with the concurrence of the Audit Committee and new members of management, concluded that certain previously filed consolidated financial statements and related financial information should no longer be relied upon.

As a result, within these consolidated financial statements, the Company has included the restated consolidated financial statements as of and for the years ended June 30, 2016 and June 30, 2015, which is referred to as the "Restatement". The Restatement corrects errors and certain irregularities which are discussed in detail within this footnote.

*The errors and certain irregularities primarily related to the timing of recognition of (i) revenue, (ii) expenses related to certain inventory used for engineering and marketing purposes and (iii) expenses related to defective products under warranty not returned by customers. Additionally, errors were identified whereby the Company had derecognized inventory while control over such inventory was retained because the Company was obligated to buy it back.*

146.    The 2017 Form 10-K described the improper revenue recognition on product sales occurring at the Company, stating in relevant part:

*During the fiscal years ended June 30, 2016 and 2015, product revenue was recognized prematurely.* As a result of the information gathered in the Investigation, Procedures and Analysis, *it was determined that there was an aggressive focus on quarterly revenue without sufficient focus on compliance by an appropriate number of competent resources, and all relevant information was not communicated among the Company's internal functions as well as the management to both the Audit Committee and the independent auditors that resulted in the inappropriate recording of revenue with insufficient documentation or rigorous assessment of revenue transactions.* The Company found instances where (i) title and risk of loss had not transferred to the customer, (ii) persuasive evidence of an arrangement with the customer consistent with the Company's customary business practices was not present, (iii) the distributor's price was not fixed or determinable, or (iv) collectibility was not reasonably assured, all of which resulted in premature recognition of revenue.

147.    The 2017 Form 10-K described the improper revenue recognition in connection with service revenues occurring at the Company, stating in relevant part:

During the fiscal years ended June 30, 2016 and 2015, *services revenue was misstated as it was determined that as a result of the information gathered in the Investigation, Procedures and Analysis there were errors related to inaccurate allocation of contract consideration for multiple element arrangements* resulting from (a) lack of proper identification or accounting for contractual service obligations, (b) incorrect allocation of

discounts to service related deliverables, and (c) lack of a robust process resulting in inaccurate determination of BESP [Best Estimated Selling Price]. Additionally, there were misalignments of the revenue recognition period and the contractual requisite service period. Consequently, certain contracts for extended warranties on products or on-site services in multiple element arrangements were incorrectly recorded as revenue at the time of sale of the product instead of being deferred and amortized over the contractual warranty or service period. The Company had previously identified a portion of these errors in the amount of $9.0 million related to extended warranty in a prior period and had adjusted the consolidated financial statements for the fiscal year ended June 30, 2016 for their cumulative effect with an out-of-period correction to revenues.

148.    The 2017 Form 10-K also revealed that the material weakness related to revenue recognition previously disclosed in November 2015 and purportedly addressed, had not been remediated as of the filing of the 2017 Form 10-K:

> ***In addition, in November 2015, we reported a material weakness in our internal control over financial reporting related to the revenue recognition of contracts with extended product warranties. This material weakness has not been fully remediated as of the filing date of this Annual Report on Form 10-K***, and we cannot ensure that other errors or material weaknesses will not be identified in the future. If we fail to maintain an effective system of internal control over financial reporting, the accuracy and timeliness of our financial reporting may be adversely affected.

149.    In connection with inventory, the Company's 2017 Form 10-K stated in relevant part:

> As of June 30, 2016 and 2015, inventories were overstated due to misapplication of accounting principles, whereby materials issued from inventory to research and development projects and marketing with no alternative use were included as inventory and expensed upon completion of a project rather than being expensed upon consumption.

> Also as of June 30, 2016 and 2015, inventories were understated due to misapplication of accounting principles, whereby (i) inventory of materials transferred to certain contract manufacturers was improperly derecognized upon transfer that the Company retained control over the materials because it was obligated to buy them back; and (ii) in-transit inventory was not being recorded in the appropriate period due to improper cut-off procedures.

150.    The Company's 2017 Form 10-K detailed numerous negative consequences in connection with material weaknesses in Super Micro's internal controls over financial reporting.  For example, Super Micro admitted in its 2017 Form 10-K that its "[f]ailure to timely file our SEC reports and make our current financial information available, ***has placed, and will continue to place, downward pressure on our stock price*** . . . ." Super Micro also stated that the delays caused by its investigation – and the further

delays it may create – resulted in "a greater degree of risk" when investing in Super Micro stock.  Further, the "lack of current public information may have an adverse impact on investor confidence, which could lead to a reduction in our stock price."  The Company also noted that its inability to file its SEC filings, "precludes us from raising debt or equity financing in the public markets and limits our access to the private markets and also limits our ability to use stock options and other equity-based awards to attract, retain and provide incentives to our employees."

151.    Further, the Individual Defendants admitted in the 2017 Form 10-K that Super Micro had incurred, and expected to continue incurring, significant expenses in connection with the investigation into and as a result of its internal control weaknesses.  Specifically, the 2017 Form 10-K stated:

> Specifically, in connection with the Audit Committee's Investigation, Procedures and Analysis, audit and compliance efforts and related litigation, ***we have incurred professional fees totaling $40.6 million in fiscal year 2018 and $50.7 million through the third quarter of fiscal year 2019***.

152.    The Individual Defendants also admitted in the 2017 Form 10-K that Super Micro's SAP system would need further enhancements and developments in order to automate internal controls.  Specifically, the 2017 Form 10-K stated:

> We have incurred and expect to continue to incur additional expenses related to our ERP systems, as we continue to further enhance and develop them, including by automating certain internal controls.

153.    The 2017 Form 10-K stated that the Company was delisted from NASDAQ due to its delays in filing periodic reports with the SEC, which presented significant risks to the Company.  In particular, the 2017 Form 10-K stated:

> The delisting of our common stock from Nasdaq may have a material adverse effect on us by, among other things, causing investors to dispose of our shares and limiting:
>
> - The liquidity of our common stock;
>
> - The market price of our common stock;
>
> - The number of institutional and other investors that will consider investing in our common stock;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- The availability of information concerning the trading prices and volume of our common stock;

- The number of broker-dealers willing to execute trades in shares of our common stock; and

- Our ability to obtain equity or debt financing for the continuation of our operations.

154.    Deloitte signed a May 16, 2019 Report of Independent Registered Public Accounting Firm ("May 16, 2019 Audit Report") in connection with its audit of Super Micro.  In the May 16, 2019 Audit Report, Deloitte emphasized Super Micro's Restatement and related party footnotes and also rendered an *adverse opinion* on the Company's internal controls due to material weaknesses:

> As discussed in Note 19 to the consolidated financial statements, *the accompanying 2016 and 2015 consolidated financial statements have been restated to correct misstatements.*

> As discussed in Note 11 to the consolidated financial statements, *the Company has significant purchases from and sales to two related parties*.

> We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of June 30, 2017, based on the criteria established in *Internal Control-Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission and *our report dated May 16, 2019 expressed an adverse opinion on the Company's internal control over financial reporting because of material weaknesses.*

155.    Deloitte also included in its May 16, 2019 Audit Report that the Company had identified deficiencies with its control environment, risk assessment, control activities and revenue recognition accounting, among other matters.  In light of Super Micro's material weaknesses, Deloitte stated, among other matters, that:

> In our opinion, because of the effect of the material weaknesses identified above on the achievement of the objectives of the control criteria, the Company *has not maintained effective internal control over financial reporting* as of June 30, 2017, based on the criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

156.    The 2017 Form 10-K also disclosed that Super Micro's Restatement and internal control weaknesses negatively impacted the Company's business and financial condition as well as its reputation:

***Matters relating to or arising from the restatement and the results of the Investigation, Procedures and Analysis of our internal control over financial reporting, including adverse publicity and potential concerns from our customers, have had and could continue to have an adverse effect on our business and financial condition.***

**The Company Files a Delayed 2019 Form 10-K with Additional Disclosures**

157.    On December 19, 2019, Super Micro filed its delayed Annual Report on Form 10-K for the fiscal year ended June 30, 2019 (the "2019 Form 10-K") with the SEC.  The 2019 Form 10-K disclosed that Defendant C. Liang had two personal margin loans exceeding $12 million collateralized by his Super Micro stock that had been called as a result of the Company's stock price decline. Defendant C. Liang received a loan from the wife of his brother, Steve Liang, to repay the financial institutions.  In particular, the 2019 Form 10-K stated:

> In October 2018, our CEO, Charles Liang, personally borrowed approximately $12.9 million from Chang Chien-Tsun, the spouse of Steve Liang. The loan is unsecured, bore interest at 0.80% per month for the first six months and the loan has no maturity date. After the first six months, the loan bears interest at 0.85% per month. The loan was made at Charles Liang's request, to provide funds to repay personal margin loans to two financial institutions, which loans had been secured by shares of our common stock held by Charles Liang. The lenders called the loans in October 2018, following the suspension of our common stock from trading on Nasdaq in August 2018 and the decline in the market price of our common stock in October 2018. As of November 30, 2019, the amount due on the unsecured loan (including principal and accrued interest) was approximately $14.5 million.

158.    The 2019 Form 10-K provided no explanation as to why this information was not disclosed in connection with the Restatement, as the improper margin loans had been outstanding since at least January 2017 and called in October 2018 by the time of its filing on May 17, 2019. Super Micro's Insider Trading Policy states that "directors [and] officers . . . are ***prohibited*** from holding Company securities in a margin account or pledging Company securities as collateral for a loan." (Emphasis in original).

159.    The 2019 Form 10-K also increased the total investigation costs related to the Restatement and work towards filing the delayed Form 10-Ks to $109 million. Additionally, the 2019 Form 10-K disclosed the Company's internal controls as of June 30, 2019 were still ineffective, and that actions remained ongoing to remediate the material weaknesses.  Some of these remediation items were not in

the 2017 Form 10-K, included the following:

- Adopted a charter for our compliance program to promote an organizational culture that encourages the highest standards of ethical business conduct and compliance with the law, exercises appropriate due diligence to prevent and detect unlawful conduct, and protects the Company's reputation; and

- Implementing a governance committee for our Sarbanes-Oxley compliance program and assigning individual accountability for internal controls.

**The SEC Issues Cease-and-Desist Orders Against the Company and Defendants Hideshima and C. Liang**

160.    H On August 25, 2020, the SEC issued separate cease-and-desist orders against the Company, Defendant Hideshima, and Defendant C. Liang.  The SEC Orders were the result of the broadened SEC investigation, from its prior misconduct in 2015, into the sales misconduct and accounting violations detailed herein.

161.    Among other things, the SEC Orders found the Company violated the federal securities laws, including certain antifraud, reporting, books and records, and internal accounting controls provisions, by filing "materially misstated financial statements" with the SEC.  The Company had prematurely recognized revenue and understated expenses from at least fiscal 2015 through fiscal 2017. In doing so, "Super Micro's executives pushed employees to maximize end-of-quarter revenue and minimize expenses, without devising and maintaining sufficient internal accounting controls to record revenue and expenses in conformity" with GAAP. Defendant Hideshima, in particular, "pressed employees to maximize revenue at the end of quarters but failed to devise and maintain sufficient internal accounting controls with respect to proper revenue recognition."  Among other things, Defendant Hideshima "received information" of improper revenue recognition and also "implemented practices that caused Super Micro to over-value inventory and under-state expenses."  Further, during the periods after the filing of the improper financial statements, Defendant C. Liang "realized profits from his sales of Super Micro stock," and had "not reimbursed those amounts to Super Micro."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

162.    The SEC Orders found that sales and accounting misconduct was pervasive throughout the Company and that executives, in particular Defendant Hideshima, were aware, or should have known, that Super Micro was consistently overstating revenue and earnings, and understating expenses, in violation of GAAP.  Defendant ***Hideshima sent "dozens of emails to salespeople and other executives at the end of each quarter to try to increase sales* . . . ."** Defendant Hideshima was also responsible for "Super Micro's revenue recognition policy" but "delegated responsibility for identifying sales terms that may affect revenue recognition to salespeople" while failing to provide them the necessary training.

163.    In order to maximize quarterly revenue, Super Micro – with Defendant Hideshima's knowledge – engaged in numerous transactions where it improperly recognized revenues prior to delivering (and at times prior to shipping) products to its customers, including by shipping goods to warehouses or storage facilities, in contravention of its agreements with customers, as well as its public statements.

> Super Micro engaged in a number of transactions where it recognized revenue prior to customer delivery ***in order to maximize revenue at the end of quarters***. In certain instances, Super Micro employees sent goods to warehouses or other storage facilities controlled by third parties at quarter-end and paid for the storage fees until the goods were delivered to its customer. In other instances, Super Micro asked its freight forwarders to hold the goods until the date that the customer was prepared to accept the goods, rather than ship and deliver them on the date agreed to with the customer. There also were instances where ***Super Micro recorded revenue although goods remained at its own warehouse***.

> In all of these transactions and other similar transactions, ***Super Micro improperly recorded revenue upon shipment from its own facility or, in a few instances, before the goods even left its facility. Recognizing the revenue was not in conformity with GAAP***.

> On multiple occasions, ***Hideshima received information indicating that revenue was being recognized prior to customer delivery, but he failed to put in place sufficient internal accounting controls to address the issue and stop these practices going forward, resulting in the premature recording and reporting of revenue.***

164.    The SEC Orders against Super Micro and Defendant Hideshima make clear that the Company, with Defendant Hideshima's knowledge, shipped products at quarter-end, in contravention of customer instructions, "in order to record and recognize the revenue prior to quarter-end."  For example,

at the end of the second quarter for fiscal 2017, Defendant Hideshima was informed that goods were shipped to a customer without authorization, the customer was then misled, and the Company improperly recognized the revenue:

> At the end of the second quarter of FY 2017, for example, a distributor customer indicated that over $250,000 of goods could not be shipped absent its authorization. A Super Micro employee still shipped the goods before quarter-end. The customer's representative complained that "no one can command you to process [our] order w/o our permission." ***Hideshima was informed that the goods were shipped without this customer's authorization***, ***and that lower level Super Micro employees misrepresented to the customer that the goods were at the warehouse when, in fact, they had already been shipped. Even after receiving this information, Hideshima failed to put sufficient internal accounting controls in place to address employees' shipment of goods without customer authorization***.

> [In another example], at the end of FY 2017, Super Micro shipped product to a customer who had not wanted the goods delivered for another month. A few days after the shipment, the customer stated "***Please reject this shipment*** . . . Why are you shipping this now?" In response, the Super Micro salesperson requested ***"Can you please help to approve this shipment to help with our quarter end? I was instructed by our management to push all the orders out before our quarter end which is also our year end***. . . . we will just need your special support for this time." The customer again rejected the request. Nevertheless, ***the revenue was improperly recognized at the time of shipment***.

> Similarly, on the last day of FY 2017, Super Micro shipped more than $278,000 of goods to a customer. In the days preceding the shipment, Super Micro employees repeatedly asked the customer to allow the goods to ship, although the employees understood that the customer did not have space for the goods. Ultimately, ***the customer instructed Super Micro not to ship out the goods until early July 2017***. A Super Micro employee, however, informed the customer that the goods had already been shipped and ***Super Micro improperly recorded the revenue in the fourth quarter of FY 2017***.

165. As detailed in the SEC Orders against Super Micro and Defendant Hideshima, between fiscal 2015 and fiscal 2017, Defendant Hideshima improperly approved recognition of more than $150 million in revenue upon shipment to a single distributor despite widespread knowledge, including Super Micro executives, that the distributor could not timely pay for the goods and revenue recognition violated GAAP:

> Super Micro had a distributor customer to which it sold hundreds of millions of dollars in products from FY 2015 to FY 2017. The distributor, however, was ***consistently unable*** to pay within its payment terms—its payables were ***often many months past due***. Super

Micro received information **on multiple occasions** that the distributor's ability to pay was tied to its receipt of funds from its own customers (i.e., end-customers).

Numerous Super Micro employees, **including executives, were aware** of the distributor's delayed payments and the fact that **the distributor could not pay** Super Micro until it sold the products to end-customers and received payment from those customers.

\*          \*          \*

On several occasions, **Hideshima was informed** of the distributor's inability to pay within payment terms and that the distributor's ability to pay was tied to its receipt of funds from its own customers (i.e., end-customers).

In light of these facts **under GAAP, Super Micro was required to recognize revenue when it received payments from its distributor customer. Nevertheless, from FY 2015 through FY 2017, Hideshima approved Super Micro's recognition of more than $150 million** in total revenue from this customer at the time of shipment.

166.     As a result of a practice instituted by Defendant Hideshima, Super Micro prevented certain customers in Russia and Eastern Europe from taking possession of products but improperly recognized the revenue anyway:

**Hideshima instituted a practice where Super Micro improperly recognized revenue while holding certain customers' bills of lading**. When Super Micro shipped goods to certain countries—primarily Russia and other Eastern European countries—Super Micro requested that the freight forwarders return the bills of lading to it. Super Micro then held the bills of lading until it received payment (either partial or in full) from its customers.

A bill of lading is a shipping document that allows a customer to clear products through customs. Absent a bill of lading, a customer ordinarily cannot take possession of the goods. Super Micro's practice was meant to ensure that Super Micro was paid by customers that had not paid in advance.

**In instances where Super Micro prevented customers from taking possession of goods until payment was received, revenue was not realized or realizable at the time of shipment under GAAP**. Accordingly, Hideshima should have known that revenue should not have been recognized.

167.     At quarter-end, the Individual Defendants caused Super Micro to improperly recognize revenue at the time of shipment on incomplete or misassembled products. Defendant Hideshima did not put in place sufficient internal accounting controls to address this improper practice and "failed to reverse the recognition of revenue after he was on notice" of the issue.  For example:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Super Micro sent *a $4 million order* to a new customer towards the end of the fourth quarter of FY 2016. *Hideshima was involved in negotiating the transaction*. While the goods were in transit, the customer informed Super Micro that the product included a wrong component. As a result of the error, the products were shipped to a warehouse where they remained until Super Micro corrected the error. Super Micro employees were required to spend significant time and effort over the following nearly two months to resolve the issue. *Hideshima was informed of these facts, and therefore he should have known it was improper to recognize the sale at the end of FY 2016 under GAAP*.

168.    Based on the foregoing, the SEC ordered Super Micro, Defendant Hideshima, and Defendant C. Liang to cease and desist from committing any future violations of the Securities Act, the Exchange Act, and SOX, and rules promulgated thereunder.  The SEC sanctioned Super Micro $17.5 million due to its misconduct.  The SEC also ordered that Defendant C. Liang reimburse the Company $2.1 million due to improperly "realized profits from his sales of Super Micro stock."

## REASONS THE STATEMENTS WERE IMPROPER

169.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing that:

(a)    As a result of improper revenue recognition, the Company materially misstated quarterly and annual financial results, including EPS, revenues, and gross margin, and balance sheet amounts;

(b)    The Company falsely claimed to meet or exceed its guidance and market expectations;

(c)    The Company falsely claimed to meet or exceed its guidance and market expectations;

(d)    The Company had significant material weaknesses in internal controls related to revenue recognition, and did not have sufficient management, accounting, and financial reporting employees with appropriate knowledge, experience, and training, resulting in material errors in its reported financials;

(e)     The Company violated GAAP and its own policies by, among other things, shipping products in advance of customer requested delivery dates, shipping products to storage facilities for later delivery, entering into side agreements, shipping incomplete products, and altering source documents related to transactions;

(f)     The Company's officers and managers failed to raise issues with material accounting deficiencies and attempted to conceal information concerning at least one sales transaction 1 from the Audit Committee and Deloitte;

(g)     The Company prematurely and improperly recognized revenue for extended warranties and on-site services at the time of sale and failed to remediate this previously disclosed material weakness; and

(h)     The accounting for transactions from fiscal year 2013 through fiscal year 2017 required reassessment, and the adjustments coupled with their aggregate magnitude required Super Micro to restate its financial results.

## DAMAGES TO THE COMPANY

170.     As a direct and proximate result of the Individual Defendants' conduct, Super Micro has been seriously harmed and will continue to be seriously harmed. Such harm includes, but is not limited to:

(a)     Legal fees associated with the Securities Class Action filed against the Company, its President, CEO and Chairman, its former CFO and former Senior Vice President of International Sales, Corporate Secretary, and board member, and amounts paid to outside lawyers, accountants, and investigators;

(b)     Any funds paid to settle the Securities Class Action

(c)     Costs and damages associated with the Restatement and delisting; and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

(d)      Costs incurred from compensation and benefits paid to the Individual Defendants who have breached their fiduciary duties.

171.     In addition, as a direct and proximate result of the Individual Defendants' conduct, Super Micro has also suffered and will continue to suffer a loss of reputation and goodwill with its business partners, regulators, and stockholders.

172.     For at least the foreseeable future, Super Micro will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Super Micro's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE ALLEGATIONS

173.     Plaintiff brings this action derivatively in the right and for the benefit of Super Micro for contribution for violations of federal securities laws.

174.     Super Micro is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

175.     Plaintiff will adequately and fairly represent the interests of Super Micro in enforcing and prosecuting its rights.

176.     Plaintiff has continuously been a stockholder of Super Micro at times relevant to the wrongdoing complained of and is a current Super Micro stockholder.

## DEMAND FUTILITY ALLEGATIONS

177.     The current Board of Super Micro consists of the following nine individuals: Defendants C. Liang, Sarah Liang, McAndrews, Tsai, Tseng, and Tuan, and relevant nonparty board members Daniel W. Fairfax, Tally Liu, and Fred Chan.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**Demand Is Excused Because Defendants C. Liang, Sara Liang, McAndrews, Tsai, Tseng, and Tuan Face a Substantial Likelihood of Liability for Their Misconduct**

178.    As alleged above, Defendants C. Liang, Sara Liang, McAndrews, Tsai, Tseng, and Tuan breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding the Company's fraudulent accounting practices and failure to maintain effective internal controls.  These defendants knew or were reckless in not knowing that: (i) the Company suffered from an inappropriate tone at the top, had a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance, and failed to monitor or enforce its own Code; (ii) the Company had significant material weaknesses in internal controls related to revenue recognition, and did not have sufficient management, accounting, and financial reporting employees with appropriate knowledge, experience, and training, resulting in material errors in its reported financials; (iii) the Company violated GAAP and its own policies by, among other things, shipping products in advance of customer requested delivery dates, shipping products to storage facilities for later delivery, entering into side agreements, shipping incomplete products, and altering source documents related to transactions; (iv) the Company's officers and managers failed to raise issues with material accounting deficiencies and attempted to conceal information concerning at least one sales transaction from the Audit Committee and Deloitte; (v) the Company prematurely and improperly recognized revenue for extended warranties and on-site services at the time of sale and failed to remediate this previously disclosed material weakness; and (vi) the accounting for transactions from fiscal year 2013 through fiscal year 2017 required reassessment, and the adjustments coupled with their aggregate magnitude required Super Micro to restate its financial results.

**Demand is Excused as to Defendants Tsai and McAndrews**

179.    Defendants Tsai and McAndrews, as members of the Audit Committee, reviewed and approved the improper financial statements.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, Defendants Tsai

and McAndrews were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, Defendants Tsai and McAndrews reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, Defendants Tsai and McAndrews caused these improper statements.

180.    Additionally, Defendants Tsai and McAndrews were charged with oversight over the Company's internal controls and reporting obligations.  Defendants Tsai and McAndrews failed in those obligations and thus allowed the Company to have deficiencies with its control environment, risk assessment, control activities and revenue recognition accounting, among other matters.  Additionally, Defendants Tsai and McAndrews allowed for the Company to consistently have improper revenue recognition, have delinquent reports with the SEC, be delisted from NASDAQ, violating federal securities laws, and being sanctioned Super Micro $17.5 million by the SEC.

181.    Demand is futile as to Tsai and McAndrews for the additional reason that they conducted the conflicted and inadequate Audit Committee investigation.  First, Tsai and McAndrews should have never undertaken to investigate their own misconduct.  Second, Tsai and McAndrews conducted a patently inadequate investigation, taking an unreasonable amount of time to complete the "investigation", resulting in additional harm to the Company stemming from delayed filings.  Moreover, the investigation failed to properly address the underlying failures and misconduct at the Company.  Thus, Defendants Tsai and McAndrews have demonstrated that demand would be futile for this additional reason.

182.    Defendants Tsai and McAndrews breached their fiduciary duty of loyalty because they participated in the wrongdoing described herein. Defendants Tsai and McAndrews face a substantial likelihood of liability for their breaches of fiduciary duty and cannot independently consider a claim against themselves, so any demand upon them is futile.

**Demand Is Excused Against Defendants C. Liang and Sara Liang for Additional Reasons**

183.    Defendants C. Liang and Sara Liang are not independent by definition and as admitted in

Super Micro's 2020 Proxy Statement on Form DEF 14A filed with the SEC on April 21, 2020.

184.   The principal professional occupation of Defendant C. Liang is his employment with Super Micro, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above.  Defendant C. Liang is the President, CEO, Chairman of the Board, Founder of the Company, and largest principal stockholder (together with Defendant Sara Liang), owning 15.8% percent of Super Micro stock.   Accordingly, Defendant C. Liang lacks independence from defendants Sara Liang, McAndrews, Tsai, Tseng, and Tuan due to his interest in maintaining his executive positions at Super Micro.  This lack of independence renders Defendant C. Liang incapable of impartially considering a demand to commence and vigorously prosecute this action. Super Micro paid Defendant C. Liang the following compensation:

| Fiscal Year | Salary | Bonus | Stock Awards | Option Awards | Total |
|---|---|---|---|---|---|
| 2018 | $386,212 | - | $3,252,000 | $1,644,005 | $5,282,217 |
| 2017 | $386,212 | $650 | - | - | $386,862 |
| 2016 | $363,776 | - | - | - | $363,776 |

Accordingly, Defendant C. Liang is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation.  Additionally, Defendant C. Liang is named as a defendant in the Securities Class Action and is thus incapable of investigating his own misconduct. Demand is futile as to Defendant C. Liang.

185.   Defendant Sara Liang will not vote to initiate litigation against Defendant C. Liang.  She is married to Defendant C. Liang and is a cofounder of the Company.  This lack of independence renders Defendant Sara Liang incapable of impartially considering a demand to commence and vigorously prosecute this action. Demand is futile as to Defendant Sara Liang.

## COUNT I

### Breach of Fiduciary Duties
### (Against the Officer Defendants)

186.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

187.    The Officer Defendants owed fiduciary duties to Super Micro and its stockholders.  By reason of their positions as fiduciaries to the Company, the Officer Defendants owed duties of good faith, loyalty, candor, and truthful disclosure.  The Officer Defendants also owed Super Micro fiduciary duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law, which impose broad obligations on defendants vis-a-vis the corporation and its individual stockholders.  In addition, the Officer Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code, had they been discharged in accordance with the Officer Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

188.    The Officer Defendants violated these fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.  The Officer Defendants were well aware of the relevant disclosure laws, rules, and regulations.

189.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Company suffered from an inappropriate tone at the top, had a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance, and failed to monitor or enforce its own Code; (ii) the Company had significant material weaknesses in internal controls related to revenue recognition, and did not have sufficient management, accounting, and financial reporting employees with appropriate knowledge, experience, and training, resulting in material errors in its reported financials; (iii) the Company violated

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

GAAP and its own policies by, among other things, shipping products in advance of customer requested delivery dates, shipping products to storage facilities for later delivery, entering into side agreements, shipping incomplete products, and altering source documents related to transactions; (iv) the Company's officers and managers failed to raise issues with material accounting deficiencies and attempted to conceal information concerning at least one sales transaction from the Audit Committee and Deloitte; (v) the Company prematurely and improperly recognized revenue for extended warranties and on-site services at the time of sale and failed to remediate this previously disclosed material weakness; and (vi) the accounting for transactions from fiscal year 2013 through fiscal year 2017 required reassessment, and the adjustments coupled with their aggregate magnitude required Super Micro to restate its financial results.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

## COUNT II

### Breach of Fiduciary Duties
### (Against the Director Defendants)

190.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

191.    The Director Defendants owed and owe Super Micro fiduciary obligations.  By reason of their fiduciary relationships, the Director Defendants specifically owed and owe Super Micro the highest obligation of good faith, fair dealing, loyalty and due care in the administration of the affairs of the Company, including, without limitation, the oversight of the Company's compliance with state and federal securities laws, rules and regulations, as well as the duty of candor and truthful disclosure with respect to their public statements.

192.    The Director Defendants also owed and owe Super Micro fiduciary duties imposed and defined by the federal securities laws, rules, regulations, and federal substantive corporate law, which impose broad obligations on defendants vis-a-vis the corporation and its individual stockholders.  The

Director Defendants violated these fiduciary duties by issuing, causing to be issued, or otherwise allowing the material omissions and misrepresentations described herein.

193.    In addition, the Director Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including its Code and the Charters of various Board Committees; had those duties been discharged in accordance with the Director Defendants' obligations, it would have prevented the misconduct and the consequent harm to the Company.

194.    Each Director Defendant violated his or her fiduciary duties by consciously causing, or consciously failing to prevent the Company from engaging in, the improper acts complained of herein.

195.    The Director Defendants knew or were reckless in not knowing that: (i) the Company suffered from an inappropriate tone at the top, had a culture of aggressively focusing on quarterly revenue without sufficient focus on compliance, and failed to monitor or enforce its own Code; (ii) the Company had significant material weaknesses in internal controls related to revenue recognition, and did not have sufficient management, accounting, and financial reporting employees with appropriate knowledge, experience, and training, resulting in material errors in its reported financials; (iii) the Company violated GAAP and its own policies by, among other things, shipping products in advance of customer requested delivery dates, shipping products to storage facilities for later delivery, entering into side agreements, shipping incomplete products, and altering source documents related to transactions; (iv) the Company's officers and managers failed to raise issues with material accounting deficiencies and attempted to conceal information concerning at least one sales transaction from the Audit Committee and Deloitte; (v) the Company prematurely and improperly recognized revenue for extended warranties and on-site services at the time of sale and failed to remediate this previously disclosed material weakness; and (vi) the accounting for transactions from fiscal year 2013 through fiscal year 2017 required reassessment, and the adjustments coupled with their aggregate magnitude required Super Micro to restate its financial results.  Accordingly, these defendants breached their duty of loyalty to the Company

196.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.   The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

197.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Super Micro has sustained significant damages, as alleged herein.   As a result of the misconduct alleged herein, these defendants are liable to the Company.

198.    Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

### COUNT III

**Against the Individual Defendants for Waste of Corporate Assets**

199.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

200.    As a result of failure to properly supervise and monitor the adequacy of Super Micro's disclosure controls and procedures, the Individual Defendants and have caused Super Micro to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

201.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

202.    Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

### COUNT IV

**Against the Individual Defendants for Unjust Enrichment**

203.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

204.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Super Micro.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Super Micro.

205.    Plaintiff, on behalf of Super Micro, has no adequate remedy at law.

## COUNT V

**Against Individual Defendants C. Liang, Wally Liaw, and Howard Hideshima For Contribution Under §§10(b) and 21D of The Exchange Act**

206.    By reason Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

207.    This claim is brought derivatively on behalf of the Company for contribution and indemnification against Defendants Charles Liang, Wally Liaw, and Howard Hideshima, each of whom is a named individual defendant in the Securities Class Action.

208.    The Company is named as a defendant in the Securities Class Action, which asserts claims under the federal securities laws for violation of §10(b) and §20(a) of the Exchange Act.  If the Company is ultimately found liable for violating the federal securities laws, the Company's liability will arise, in whole or in part, from the intentional, knowing, or reckless acts or omissions of Defendants C. Liang, Wally Liaw, and Howard Hideshima, as alleged herein.  The Company is entitled to receive contribution from the Individual Defendants in connection with the Securities Class Action against the Company.

209.    As directors and/or officers of the Company, Defendants C. Liang, Wally Liaw, and Howard Hideshima had the power and/or ability to, and did, directly or indirectly control or influence the Company's business operations and financial affairs, including the content of public statements about the Company, and had the power and/or ability directly or indirectly to control or influence the specific corporate statements and conduct that violated §10(b) of the Exchange Act.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

210.     Defendants C. Liang, Wally Liaw, and Howard Hideshima are liable under §10(b) of the Exchange Act, 15 U.S.C. §78j(b), pursuant to which there is a private right of action for contribution, and §21D of the Exchange Act, 15 U.S.C. §78u-4, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

211.     Accordingly, the Company is entitled to all appropriate contribution or indemnification from Charles Liang, Wally Liaw, and Howard Hideshima, who are responsible for exposing the Company to liability under the federal securities laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of Super Micro, demands judgment as follows:

A.     Declaring that Plaintiff may maintain this action on behalf of Super Micro and that Plaintiff is an adequate representative of the Company;

B.     Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and for contribution for violations of federal securities laws;

C.     Directing Super Micro to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

1.     A proposal to strengthen the Company's accounting and disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and the public;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

2.      A proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

3.      A provision to permit the stockholders of Super Micro to nominate three candidates for election to the Board;

D.      Directing defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Super Micro's directors, officers, and employees do not engage in wrongful or illegal practices;

E.      Granting additional appropriate equitable and/or injunctive relief to remedy defendants' misconduct, as permitted by law;

F.      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Super Micro;

G.      Determining and awarding to Super Micro the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest;

H.      Awarding Super Micro restitution from the Individual Defendants, and each of them;

I.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

J.      Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

DATED: May 5, 2021                          Respectfully submitted,

                                            **BRODSKY SMITH**

                                            Evan J. Smith (SBN 242352)
                                            9595 Wilshire Boulevard, Suite 900

- 75 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Beverly Hills, CA 90212
Telephone: (877) 534-2590
Facsimile: (310) 247-0160
Email: esmith@brodskysmith.com

OF COUNSEL:

POMERANTZ LLP
Gustavo F. Bruckner
Samuel J. Adams
600 Third Avenue
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
Email: gfbruckner@pomlaw.com
sjadams@pomlaw.com

***Attorneys for Plaintiff***

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT